KALOTI ENTERPRISES, INC.,
Plaintiff-Appellant,

v.

KELLOGG SALES COMPANY and Geraci
& Associates, Inc., Defendants-Respondents.

Supreme Court

*No. 2003AP1225. Oral argument January 7, 2005.
—Decided July 8, 2005.*

2005 WI 111

(Also reported in 699 N.W.2d 205.)

562

For the plaintiff-appellant there were briefs by *Michael P. Stupar, George S. Peek* and *Stupar, Schuster & Cooper, S.C.,* Milwaukee, and oral argument by *George S. Peek.*

For the defendant-respondent, Geraci & Associates, Inc., there was a brief by *Scott W. Hansen, Laura A. Brenner, James J. Eichholz* and *Reinhart Boerner Van Deuren, S.C.,* Milwaukee, and oral argument by *Jeremy P. Levinson.*

For the defendant-respondent, Kellogg Sales Company, there was a brief by *Brian R. Smigelski, Jeremy P. Levinson* and *Friebert, Finerty & St. John, S.C.,* Milwaukee, and oral argument by *Jeremy P. Levinson.*

An amicus curiae brief was filed by *William C. Gleisner, III,* and *Law Offices of William C. Gleisner, III,*

Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. On certification from the court of appeals, we review a decision of the circuit court for Waukesha County dismissing an amended complaint filed by petitioner, Kaloti Enterprises, Inc. (Kaloti), against respondents, Kellogg Sales Company (Kellogg) and Geraci & Associates, Inc. (Geraci), for failure to state a claim. The court of appeals certified two questions that can be summarized as follows: (1) whether a duty to disclose facts arises between sophisticated parties to a commercial transaction where the parties have an established practice of doing business and the facts are material to a change in that practice of doing business; (2) whether Kaloti's intentional misrepresentation claim is barred by the economic loss doctrine.

¶ 2. Based solely on Kaloti's allegations, we conclude that Kellogg and Geraci had a duty of disclosure that they failed to satisfy, thereby providing a basis for Kaloti's intentional misrepresentation claim, and that under these circumstances, Kaloti's intentional misrepresentation claim was not barred by the economic loss doctrine. Therefore, we reverse the circuit court's dismissal of Kaloti's amended complaint, and we remand for further proceedings.

## I. BACKGROUND[1]

¶ 3. Kellogg is a wholly owned subsidiary corporation of Kellogg Company, Inc. Kaloti is a wholesaler of

---

[1] Because this is an appeal of a dismissal for failure to state a claim, we accept as true, for the purpose of this review, the facts alleged in the amended complaint. *See Ollerman v. O'Rourke Co.,* 94 Wis. 2d 17, 24, 288 N.W.2d 95 (1980).

food products. Over several years, Kellogg and Kaloti entered into numerous transactions through Geraci, Kellogg's agent. In each transaction, Geraci approached Kaloti to sell Kellogg products. Geraci negotiated all elements of the transaction for Kellogg, including product specifics, price, delivery schedule, allowances and terms of sale. Geraci accepted purchase orders from Kaloti and processed these orders, which were ultimately accepted by Kellogg. Following the negotiation of each contract, Kellogg "drop shipped" its product directly to Kaloti. Fleming-Marshfield, Inc. invoiced Kaloti and collected for Kellogg. Kaloti then sold Kellogg's products.

¶ 4. Kaloti alleges that, through a series of such transactions, a practice of doing business arose among Kaloti, Geraci and Kellogg, and that Geraci and Kellogg were aware that Kaloti bought Kellogg's products to resell them "as a 'secondary supplier' to large market stores."

¶ 5. Kellogg Company, Inc. acquired Keebler Foods Company (Keebler). As a result of that acquisition, Kellogg changed how it marketed NutriGrain and Rice Krispie Treat products. Instead of marketing these products through distributors or wholesalers such as Kaloti, Kellogg decided to sell them directly to the same large market stores to which Kaloti sold Kellogg's products. Kaloti did not know of Kellogg's decision to begin direct sales.

¶ 6. On May 14, 2001, after Geraci knew that Kellogg had changed to a direct-sales mode of marketing, Geraci solicited an order from Kaloti. The order was a $124,000 "quarterly promotion order," for Nutri-Grain and Rice Krispie Treats. Because of their past dealings with Kaloti, Geraci and Kellogg knew that it would take Kaloti three months to resell this order.

Kaloti intended to market this order as it had in prior instances, as a secondary supplier to large stores, and it relied on that market being open. Further, in soliciting and accepting Kaloti's order, Geraci and Kellogg knew that Kellogg's change in marketing scheme would deny Kaloti the market it had used in the past to resell Kellogg's products.

¶ 7. Kellogg delivered the order to Kaloti on June 1, 2001, and Kaloti paid for it.[2] On or about June 14, 2001, Kaloti's major and usual customers notified Kaloti that they would no longer purchase products from Kaloti because Kellogg was selling directly to them.

¶ 8. On June 15, 2001, Geraci representative Michael Angele told Kaloti employee Mary Beth Welhouse that Geraci had not advised Kaloti of Kellogg's anticipated change in marketing strategy because of a confidentiality agreement between Kellogg and Geraci in respect to Kellogg's new marketing strategy. The same day, Kaloti notified Geraci and Kellogg that it was rescinding the May 14, 2001 purchase, advising them that it would not have placed the order or accepted the product if it had known that Kellogg had changed to a direct-sales mode of marketing. Kaloti attempted to return the product, but Kellogg has refused to accept delivery and has refused to reimburse Kaloti.

¶ 9. Kaloti alleges that Geraci and Kellogg acted intentionally in concealing facts material to Kellogg's change in marketing strategy, which change caused Kaloti to be shut out of the market it had utilized in the past to resell Kellogg's products. Kaloti attempted to

---

[2] Kaloti paid for this product pursuant to invoicing from Fleming-Marshfield, although it is not clear from the amended complaint when this payment was made.

mitigate its damages and claims that, notwithstanding those efforts, it has lost $100,000 due to Kellogg's intentional misrepresentation.

## II. DISCUSSION

### A. Standard of Review

¶ 10. We review a dismissal for failure to state a claim as a question of law, without deference to the circuit court's decision. *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 11, 270 Wis. 2d 146, 677 N.W.2d 233; *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 245, 593 N.W.2d 445 (1999). In the present case, our inquiry begins with consideration of whether the amended complaint states an intentional misrepresentation claim, the determination of which turns on whether Geraci and Kellogg had a duty to disclose certain facts to Kaloti. Whether a duty exists is also a question of law that we review independently of the circuit court. *See Ritchie v. Clappier*, 109 Wis. 2d 399, 403, 326 N.W.2d 131 (Ct. App. 1982). And finally, the application of the economic loss doctrine to a set of facts presents another question of law for our independent review. *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 15, 276 Wis. 2d 361, 688 N.W.2d 462.

### B. Failure to State a Claim

¶ 11. A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint to state a claim for which relief may be granted. *Tietsworth*, 270 Wis. 2d 146, ¶ 11. When testing the legal sufficiency of

a claim, all facts alleged in the complaint, as well as all reasonable inferences from those facts, are accepted as true. *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 24, 288 N.W.2d 95 (1980). Furthermore, pleadings are liberally construed. *Id.* The complaint need not state all the ultimate facts constituting the cause of action, but rather, the complaint should be dismissed as legally insufficient only if there are no conditions under which the plaintiff can recover. *Id.*

## C. Intentional Misrepresentation

¶ 12. There are three categories of common law misrepresentation: intentional, negligent and strict liability misrepresentation. *Tietsworth,* 270 Wis. 2d 146, ¶ 12. Kaloti's claim is for intentional misrepresentation, sometimes referred to as fraudulent misrepresentation, *Ramsden v. Farm Credit Services of North Central Wisconsin ACA,* 223 Wis. 2d 704, 718 n.9, 590 N.W.2d 1 (Ct. App. 1998), or common-law fraud, *see Tietsworth,* 270 Wis. 2d 146, ¶ 51. To state a claim for intentional misrepresentation, the following allegations must be made:

> (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Ramsden,* 223 Wis. 2d at 718–19 (footnote omitted); *accord Tietsworth,* 270 Wis. 2d 146, ¶ 13.

¶ 13. An intentional misrepresentation claim may arise either from a "failure to disclose a material fact" or from a "statement of a material fact which is untrue." *See Ramsden,* 223 Wis. 2d at 713. Here, Kaloti's intentional misrepresentation claim is based on the failure to disclose a material fact. However, "[a] person in a business deal must be under a duty to disclose a material fact before he can be charged with a failure to disclose." *Southard v. Occidental Life Ins. Co.,* 31 Wis. 2d 351, 359, 142 N.W.2d 844 (1966); *accord Tietsworth,* 270 Wis. 2d 146, ¶ 14 (citing *Ollerman,* 94 Wis. 2d at 26). When there is a duty to disclose a fact, the law has treated the failure to disclose that fact " 'as equivalent to a representation of the nonexistence of the fact.' " *Hennig v. Ahearn,* 230 Wis. 2d 149, 165, 601 N.W.2d 14 (Ct. App. 1999) (quoting *Ollerman,* 94 Wis. 2d at 26).[3]

¶ 14. Whether Kellogg and Geraci had a duty to disclose is the only aspect of Kaloti's intentional misrepresentation claim that is at issue here. In particular, we are asked to determine whether Kellogg and Geraci had a duty to disclose a change in Kellogg's marketing strategy that largely closed the markets on which they knew Kaloti relied to sell Kellogg's products.

---

[3] We have never held that a claim for strict responsibility for misrepresentation or negligent misrepresentation can arise from a failure to disclose. Therefore, it remains an open question. In *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.,* 1 F.3d 621, 627 (7th Cir. 1993), cited by the concurrence at ¶ 68, claims for strict responsibility for misrepresentation and negligent misrepresentation were brought; however, the court did not address whether these claims can arise solely from the breach of a duty to disclose.

¶ 15. In *Ollerman,* we decided that a duty to disclose had arisen in the course of a real estate transaction. We discussed at length the circumstances under which a duty to disclose a material fact may arise in business transactions. *Ollerman,* 94 Wis. 2d at 24–43. The usual rule is that there is no duty to disclose in an arm's-length transaction. *Id.* at 29. However, courts have carved out a number of exceptions to that rule and have refused to apply the rule when to do so would work an injustice.[4] *Id.* at 30.

¶ 16. Determining whether there is a legal duty and the scope of that duty presents questions of law that require courts to make policy determinations. *Tietsworth,* 270 Wis. 2d 146, ¶¶ 14–15; *see also Ollerman,* 94 Wis. 2d at 27. The *Ollerman* decision noted that, in making this determination,

> many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community.

---

[4] For example, we noted in *Ollerman* that courts have not applied the usual rule:

> where the seller actively conceals a defect or where [the seller] prevents investigation; where the seller has told a half-truth or has made an ambiguous statement if the seller's intent is to create a false impression and [the seller] does so; where there is a fiduciary relationship between the parties; or where the facts are peculiarly and exclusively within the knowledge of one party to the transaction and the other party is not in a position to discover the facts.

*Ollerman,* 94 Wis. 2d at 31.

*Ollerman,* 94 Wis. 2d at 28 (quotations and quoted source omitted). As to the mores of the commercial world in particular, we further explained in *Ollerman,* "[T]he type of interest protected by the law of misrepresentation in business transactions is the interest in formulating business judgments without being misled by others—that is, an interest in not being cheated." *Id.* at 29–30.

¶ 17. We note that the Restatement (Second) of Torts § 551 cmt. L (1977),[5] as well as several of the illustrations provided with it, have the following elements: (1) the non-disclosing party knew that the other party was not aware of the fact; (2) the mistaken party could not discover the fact by ordinary investigation or inspection, or he or she could not otherwise reasonably be expected to discover the fact; and (3) the mistaken party would not have entered into the transaction if he or she knew the fact.

¶ 18. The second element, that the mistaken party could not reasonably be expected to discover the fact, is particularly important to the present analysis. As we remarked in *Ollerman,* parties to a business transaction must "use their faculties and exercise ordinary business sense, and not [] call on the law to stand

---

[5] The comment provides this example:

> [A] seller who knows that his cattle are infected with tick fever or contagious abortion is not free to unload them on the buyer and take his money, when he *knows that the buyer is unaware of the fact, could not easily discover it, would not dream of entering into the bargain if he knew* and is relying upon the seller's good faith and common honesty to disclose any such fact if it is true.

Restatement (Second) of Torts § 551 cmt. L (1977) (emphasis added).

*in loco parentis* to protect them in their ordinary dealings with other business people." *Ollerman,* 94 Wis. 2d at 30. Further, "in a free market the diligent should not be deprived of the fruits of superior skill and knowledge lawfully acquired." *Id.* at 29–30; *see also Market St. Assocs. Ltd. P'ship v. Frey,* 941 F.2d 588, 593–94 (7th Cir. 1991) (remarking that "the law contemplates that people frequently will take advantage of the ignorance of those with whom they contract, without thereby incurring liability").

¶ 19. However, it is another matter entirely when one party exclusively holds knowledge of facts material to the transaction that the other party has no means of acquiring. As we said in *Ollerman,* "where the [material] facts are peculiarly and exclusively within the knowledge of one party to the transaction and the other party is not in a position to discover the facts for himself [or herself]," disclosure is required. *Ollerman,* 94 Wis. 2d at 31. We similarly noted prominent legal commentator Dean Prosser's observation that courts have tended to find a duty to disclose in cases "*where the defendant has special knowledge or means of knowledge not open to the plaintiff* and is aware that the plaintiff is acting under a misapprehension as to facts which could be of importance to him, and would probably affect his decision." *Id.* at 31–32 (quoting William L. Prosser, *The Law of Torts* 697 (1971) (emphasis added).

■■

¶ 20. Drawing on the above-stated principles from our case law, we conclude that a party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2)

the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

¶ 21. In turning to application of this standard in the present case, we note the requirements of Wis. Stat. §§ 802.02 and 802.03(2) (2001–02)[6] that regard, respectively, pleadings generally and pleadings in cases of fraud. While § 802.02(1)(a) provides that pleadings setting forth a claim for relief need to contain "[a] short and plain statement of the claim," § 802.03(2) provides, "In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Pursuant to § 802.03(2), "allegations of fraud must specify the particular individuals involved, where and when misrepresentations occurred, and to whom misrepresentations were made." *Putnam v. Time Warner Cable of S.E. Wisconsin, Ltd. P'ship*, 2002 WI 108, ¶ 26, 255 Wis. 2d 447, 649 N.W.2d 626 (citing *Friends of Kenwood v. Green*, 2000 WI App 217, ¶ 16, 239 Wis. 2d 78, 619 N.W.2d 271). Such detailed pleadings put defendants on notice "so that they may prepare meaningful responses to the claim." *Id.* (quotations and quoted source omitted).

¶ 22. We conclude that the allegations Kaloti made in its amended complaint satisfy the statutory

---

[6] All further references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

pleading requirements and are sufficient, if proved at trial, to establish that Kellogg and Geraci each had a duty of disclosure. First, that Kellogg would be selling directly to the large stores in Kaloti's usual area of distribution is material, as Kaloti, a wholesaler and secondary supplier, bought products from Kellogg in order to resell them to these same large stores and would not have placed the May 14, 2001 order if it had known that Kellogg was going to sell directly. Second, Kellogg and Geraci knew that Kaloti was buying the products to resell them to these same stores, and that Kellogg's new mode of marketing would largely deny Kaloti its customary market. Third, while the Kellogg-Keebler merger may have been publicly announced, we infer from the confidentiality agreement between Kellogg and Geraci that the decision of Kellogg to engage in direct sales, rather than to sell through distributors or wholesalers, was not publicly announced. Accordingly, the fact that Kellogg had changed its mode of marketing was peculiarly and exclusively within Kellogg and Geraci's knowledge, and Kaloti could not reasonably be expected to have discovered this fact. Finally, because Kaloti had bought products from Kellogg for the purpose of acting as a secondary supplier for a number of years, it would be reasonable for Kaloti to expect that if Kellogg was going to sell these products directly to the same stores to which Kaloti customarily sold, Kellogg and its agent, Geraci, would advise Kaloti of this.

■

¶ 23. Kellogg and Geraci argue that they had no duty of disclosure to Kaloti because they were sophisticated, commercial entities engaged in an arm's-length transaction. As support for this proposition, they cite two federal court cases, *Guyer v. Cities Service Oil Co.,*

440 F. Supp. 630 (E.D. Wis. 1977) and *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.*, 1 F.3d 621 (7th Cir. 1993). First, federal cases applying Wisconsin law provide persuasive, but not precedential, authority. *See Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400, 573 N.W.2d 842 (1998) ("This court is not bound by a federal court's interpretation of Wisconsin law."). In the 1977 *Guyer* decision, the district court concluded that the defendant oil company did not have a duty to disclose a change in marketing strategy to its gas station operators and lessees because there was no fiduciary relationship between the parties. *Guyer*, 440 F. Supp. at 633. *Guyer* was decided several years before our decision in *Ollerman* that recognized a broadening of Wisconsin law regarding the duty of disclosure and is therefore not persuasive. *See id.; Ollerman*, 94 Wis. 2d at 29–42. In *Badger Pharmacal*, the Seventh Circuit stated that "[w]hen two corporations, with the benefit of counsel, negotiate a commercial transaction at arms length, neither owes nor assumes a duty to disclose information to the other." *Badger Pharmacal*, 1 F.3d at 627. This mischaracterizes Wisconsin law by speaking too broadly and by failing to recognize that there are exceptions to the traditional "no duty to disclose" rule. *See Ollerman*, 94 Wis. 2d at 29–42.

¶ 24. Kellogg and Geraci further argue that an expansion of tort law will "wreak uncertainty on commercial arrangements that depend on order and certainty" and that, rather than rely on tort law, Kaloti should have acted diligently and negotiated contract terms to address the allocation of the risk at issue here. However, we are satisfied that our narrow holding in this case balances the general requirement that each party to a transaction must diligently protect its own self-interest, *Ollerman*, 94 Wis. 2d at 30, against the

business community's interest in formulating business judgments without being intentionally misled by others, *id.*

¶ 25. Kellogg also argues that it had no duty of disclosure to Kaloti because the fact at issue did not satisfy the "basic fact" threshold,[7] as that term was proposed in the Restatement (Second) of Torts § 551(2)(e), a standard that *Ollerman* drew upon. However, we declined in *Ollerman* to adopt the "basic fact" element of the Restatement standard, holding instead that it was the materiality of the fact that mattered. *Ollerman,* 94 Wis. 2d at 42. We similarly decline to adopt the "basic fact" versus "material fact" distinction and reaffirm that the relevant inquiry, as to that element of the standard articulated above, is whether the fact is material. *See id.* Any implication to the contrary taken from the concurrence, ¶ 61, would be misplaced.[8]

---

[7] Comment j to Restatement (Second) of Torts § 551, discusses the distinction the Restatement position makes between facts that are basic and those that are material, stating in part:

A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic.

[8] The concurrence implies that *Hennig v. Ahearn,* 230 Wis. 2d 149, 601 N.W.2d 14 (Ct. App. 1999) concluded that an actionable failure to disclose must be one of a "basic" fact. Concurrence, ¶ 61 n.14. The concurrence misreads *Hennig.* *Hennig* relied on *Ollerman* and *Ollerman's* extensive quotes of the Restatement (Second) of Torts. *Hennig,* 230 Wis. 2d at

¶ 26. While we conclude that the allegations made in Kaloti's amended complaint are sufficient to state that Kellogg and Geraci had a duty of disclosure that they failed to meet, we note that Kaloti still must prove all the elements of the claim at trial, including whether the fact in question was material, whether Kellogg or Geraci knew Kaloti was mistaken as to this fact, whether Kaloti should reasonably have been expected to discover the fact, and whether Kaloti's reliance on Kellogg and Geraci's silence was justifiable. *See Ollerman,* 94 Wis. 2d at 42–43.[9]

## D. Economic Loss Doctrine

¶ 27. Kellogg and Geraci also argue that the economic loss doctrine bars Kaloti's intentional misrepresentation claim. The economic loss doctrine is a judicially created rule, introduced in Wisconsin in *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 437 N.W.2d 213 (1989). In *Sunnyslope,* we held that "a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly, as here, where the warranty given by

165–68. In its own wording of the duty to disclose, it did not use "basic" fact as a necessary criterion. *Id.* Instead, *Hennig* explored whether the insertion of new terms into a contract without disclosing that the insertion had been made could rise to the level of an intentional misrepresentation. *Id.* at 165.

[9] The concurrence suggests that the majority opinion imposes a duty to disclose that is "well beyond our caselaw," concurrence, ¶ 57, and it also laments that we have not permitted use of this duty to disclose on a broad enough basis, *id.* at ¶ 55. For the reasons set out above and below, we disagree with both assertions.

the manufacturer specifically precludes the recovery of such damages." *Id.* at 921; *accord, e.g., Cease Elec.,* 276 Wis. 2d 361, ¶ 22. Since *Sunnyslope,* Wisconsin courts have further defined the parameters of the economic loss doctrine and referred to it more broadly as "preclud[ing] contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Van Lare v. Vogt, Inc.,* 2004 WI 110, ¶ 19, 274 Wis. 2d 631, 683 N.W.2d 46 (quoting *Tietsworth,* 270 Wis. 2d 146, ¶ 23).

¶ 28. The economic loss doctrine is " 'based on an understanding that contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena.' " *Tietsworth,* 270 Wis. 2d 146, ¶ 26 (quoting *Daanen,* 216 Wis. 2d at 403–04). As such, its purpose is to preserve the distinction between contract and tort by requiring transacting parties to pursue only their contractual remedies when asserting an economic loss claim. *Cease Elec.,* 276 Wis. 2d 361, ¶ 24. As we first explained in *Daanen* and have repeated many times, the economic loss doctrine seeks to further the following policies: " '(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.' " *E.g., Van Lare,* 274 Wis. 2d 631, ¶ 17 (quoting *Daanen,* 216 Wis. 2d at 403).

¶ 29. For purposes of the economic loss doctrine, we have defined "economic loss" as "damages resulting from inadequate value because the product is inferior

and does not work for the general purposes for which it was manufactured and sold." *Daanen,* 216 Wis. 2d at 400–01 (quotations and quoted source omitted); *accord, e.g., Cease Elec.,* 276 Wis. 2d 361, ¶ 23. Recovery for "economic loss" refers to recovery as a result of a product failing in its intended use, *Daanen,* 216 Wis. 2d at 405–06, or failing to live up to a contracting party's expectations, *see Tietsworth,* 270 Wis. 2d 146, ¶ 24. "Economic loss" does not include personal injury or damage to other property. *Daanen,* 216 Wis. 2d at 402.

¶ 30. Wisconsin courts have recognized that the economic loss doctrine bars misrepresentation claims based in negligence, *Prent Corp. v. Martek Holdings, Inc.,* 2000 WI App 194, ¶ 21, 238 Wis. 2d 777, 618 N.W.2d 201, and strict responsibility, *Van Lare,* 274 Wis. 2d 631, ¶ 28. However, we have not heretofore decided whether and to what extent the economic loss doctrine bars claims for fraud in the inducement, as alleged here. *See Tietsworth,* 270 Wis. 2d 146, ¶¶ 31–35. Liability for fraud in the inducement requires that the five elements of an intentional misrepresentation claim for relief, as discussed above, are satisfied, and in addition, that the misrepresentation has occurred before contract formation. *See Digicorp, Inc. v. Ameritech Corp.,* 2003 WI 54, ¶ 52, 262 Wis. 2d 32, 662 N.W.2d 652.

¶ 31. Courts have generally taken three different approaches in determining whether and to what extent there is a fraud in the inducement exception to the economic loss doctrine: (1) no exception; (2) a general exception for all fraud in the inducement claims; and (3) a narrow exception for fraud in the inducement where the fraud is not interwoven with the quality or character of the goods for which the parties contracted or otherwise involved performance of the contract.

¶ 32. In *Huron Tool,* 532 N.W.2d 541 (Mich. Ct. App. 1995), the defendant had agreed to provide the plaintiff with a computer software system, but the plaintiff later alleged that the system was defective and asserted a number of claims against the defendant, including fraud. *Huron Tool,* 532 N.W.2d at 543. The *Huron Tool* decision discussed the policy rationale for the economic loss doctrine, explaining that the doctrine "encourages parties to negotiate economic risks through warranty provisions . . . [and] shield[s] a defendant from unlimited liability for all economic consequences of a negligent act, . . . thus keeping the risk of liability reasonably calculable." *Id.* at 545 (citations omitted). However, the court held that there was a narrow exception to that doctrine for fraud in the inducement. *Id.* at 545.

¶ 33. *Huron Tool* defined fraud in the inducement, for the purpose of describing it as an exception to the economic loss doctrine, as follows:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely —which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.

*Id.* The court also described a type of misrepresentation that, although it could take place before a contract is entered into and for the purpose of inducing another to enter into the contract, was not included in its conceptualization of the fraud in the inducement exception: "In contrast, where the only misrepresentation by the dishonest party *concerns the quality or character of the goods sold,* the other party is still free to negotiate warranty and other terms to account for possible defects in the goods." *Id.* (emphasis added).

¶ 34. The *Huron Tool* decision characterized the distinction between these two types of fraud as that between fraud that is "interwoven with the breach of contract," which is barred by the economic loss doctrine, and fraud that is "extraneous to the contract," which is not barred by that doctrine. *Id.* As to fraud that is "interwoven," "the misrepresentations relate to the breaching party's *performance of the contract* and do not give rise to an independent cause of action in tort." *Id.* (emphasis added).

¶ 35. The *Huron Tool* decision concluded that the fraudulent representations alleged by the plaintiff concerned the quality and characteristics of the software system sold by the defendants. *Id.* at 546. As such, the representations were "indistinguishable from the terms of the contract and warranty" and thus "fail[ed] to allege any wrongdoing by defendants independent of . . . breach of contract and warranty." *Id.* Put another way, it was the performance of the contract that was really at issue, e.g., whether the product provided met the plaintiff's expectations, and thus contract law remedies, not tort remedies, were appropriate. *See id.*

¶ 36. In Wisconsin, federal courts applying Wisconsin law have attempted to predict how the Wisconsin Supreme Court would rule. *See Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co.*, 123 F.3d 675, 682 (7th Cir. 1997) (predicting that Wisconsin would not allow an intentional misrepresentation claim seeking to recover economic damages); *Budgetel Inns, Inc. v. Micros Sys., Inc.*, 8 F. Supp. 2d 1137, 1149 (E.D. Wis. 1998) (predicting that Wisconsin would provide a general fraud in the inducement exception); *Raytheon Co. v. McGraw-Edison Co.*, 979 F. Supp. 858, 872 (E.D.

Wis. 1997) (predicting that Wisconsin would adopt the narrow *Huron Tool* exception for fraud in the inducement claims).

¶ 37. Then, in *Douglas-Hanson Co. v. BF Goodrich Co.*, 229 Wis. 2d 132, 598 N.W.2d 262 (Ct. App. 1999), the court of appeals held that there was a general fraud in the inducement exception to the economic loss doctrine. *Id.* at 137–38 (concluding that "the economic loss doctrine does not preclude a plaintiff's claim for intentional misrepresentation when the misrepresentation fraudulently induces a plaintiff to enter into the contract"); *see also Kailin v. Armstrong,* 2002 WI App 70, ¶ 30, 252 Wis. 2d 676, 643 N.W.2d 132 (applying the general fraud in the inducement exception as articulated in *Douglas-Hanson*). The *Douglas-Hanson* defendants petitioned this court for review, and due to a 3–3 decision by the participating justices, the court of appeals decision was affirmed. *Douglas-Hanson Co. v. BF Goodrich Co.,* 2002 WI 22, ¶¶ 1–2, 233 Wis. 2d 276, 607 N.W.2d 621.

¶ 38. We were subsequently asked to consider the same question in *Digicorp.* Five justices participated in *Digicorp,* and we again issued a split decision, with Justice Prosser joining Justice Crooks' lead opinion, Justice Sykes concurring in part and dissenting in part, and Justices Bradley and Bablitch dissenting. *Digicorp,* 262 Wis. 2d 32, ¶ 5 n.2. Justices Crooks and Prosser agreed on a *Huron Tool*-type exception, while Justices Bradley and Bablitch stated that the *Douglas-Hanson* general fraud in the inducement exception should have been adopted. *Digicorp,* 262 Wis. 2d 32, ¶ 5 n.2. Justice Sykes, however, stated in her dissent that she would not adopt any exception to the economic loss doctrine for fraud. *Id.* Therefore, as the lead opinion summarized, "A majority [held] that a fraud in the inducement

exception to the economic loss doctrine exists, but there [was] an even split as to what the fraud in the inducement exception entails." *Id.*

¶ 39. We were again asked to address whether there was a fraud in the inducement exception to the economic loss doctrine in *Tietsworth*. The *Tietsworth* plaintiffs alleged that they had been fraudulently induced by a motorcycle manufacturer to buy motorcycles with defective cam bearing mechanisms. *Tietsworth,* 270 Wis. 2d 146, ¶ 8.

¶ 40. In *Tietsworth,* we explained that, in *Digicorp,* "[a] majority of the justices participating . . . overruled *Douglas-Hanson* to the extent that it recognized a broad exception to the economic loss doctrine for all claims of fraud-in-the-inducement of a contract." *Tietsworth,* 270 Wis. 2d 146, ¶ 32. As to the *Huron Tool*-type exception applied in the *Digicorp* lead opinion, we decided that the facts of the *Tietsworth* case would not satisfy such an exception, as the fraud alleged in *Tietsworth* "plainly pertain[ed] to the character and quality of the goods that [were] the subject matter of the contract." *Id.,* ¶ 35. Therefore, we concluded that the *Tietsworth* case did not present an opportunity for us to determine whether we would recognize a *Huron Tool*-type exception. *Id.*

¶ 41. In the present case, we again face the question of whether we will recognize a fraud in the inducement exception to the economic loss doctrine. Kellogg and Geraci submit that we should not adopt an exception, including a *Huron Tool*-type exception. They argue that an exception would undermine the ability of parties to a transaction, and especially parties to a commercial transaction, to allocate and protect against risk as they see fit. They argue further that an exception would inject the unpredictability and uncertainty

of tort law into such transactions. Accordingly, Geraci asserts, "Allowing a commercial entity to use tort law to obtain rights that its contract did not give it would effectively allow it to rewrite its agreement retroactively and recoup unbargained-for benefits."

¶ 42. We disagree and adopt a narrow fraud in the inducement exception, akin to that established in *Huron Tool* and carefully explained by the lead opinion in *Digicorp.* Accordingly, we hold that a fraud in the inducement claim is not barred by the economic loss doctrine "where the fraud is extraneous to, rather than interwoven with, the contract." *See Digicorp,* 262 Wis. 2d 32, ¶ 47; *Huron Tool,* 532 N.W.2d at 545. To invoke this narrow fraud in the inducement exception where, as here, the failure of a party to a business transaction to disclose a fact serves as the basis for a fraudulent inducement to contract claim, a plaintiff must show that: (1) there was an intentional misrepresentation, the five elements of which are set out above; (2) the misrepresentation occurred before the contract was formed, *see Digicorp,* 262 Wis. 2d 32, ¶ 52; and (3) "the fraud [was] extraneous to, rather than interwoven with, the contract." *See id.,* ¶ 47. Or stated another way, the fraud concerns matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract. *See id.; Huron Tool,* 532 N.W.2d at 545; *see also Raytheon,* 979 F. Supp. at 872 (quoting a Florida appellate court's argument that the relevant inquiry is " 'the relationship between the inducing representation and the essential requirements, expressed or implied, of the contract agreed to by the parties' ").

¶ 43. To further explain, misrepresentations that concern "the quality or character of the goods sold," *Huron Tool,* 532 N.W.2d at 545, are either: (1) expressly dealt with in the contract's terms, or (2) if they are not dealt with explicitly in the contract's terms, they go to reasonable expectations of the parties to the risk of loss in the event the goods purchased did not meet the purchaser's expectations, *see Digicorp,* 262 Wis. 2d 32, ¶ 47; *see also Huron Tool,* 532 N.W.2d at 545 (explaining that "misrepresentations [that] relate to the breaching party's performance of the contract" are interwoven with the contract and "do not give rise to an independent cause of action in tort").

¶ 44. Applying this standard to the present case, we have already established above, for the purpose of this review, that Kaloti has stated a claim for intentional misrepresentation. The only disputed aspect of that claim, whether Kellogg and Geraci had a duty to disclose, was sufficiently alleged in Kaloti's amended complaint. Therefore, the first element is established. The second element is also established because the misrepresentation that Kaloti alleges, that Kellogg and Geraci did not inform Kaloti of a change in Kellogg's mode of marketing that closed Kaloti's market · for reselling the Kellogg products, took place before Kaloti entered into the May 14, 2001 contract.

¶ 45. Finally, the intentional misrepresentation alleged by Kaloti is extraneous to, not interwoven with, the contract. It does not concern Kellogg and Geraci's performance of the contract with Kaloti, and it does not regard the quality or character of the NutriGrain and Rice Krispie Treat products that Kellogg sold Kaloti. Rather, the alleged misrepresentation concerned a mat-

ter whose risk was never contemplated to be a part of the contract to purchase Kellogg's products. The fact that Kellogg and Geraci allegedly knew that Kellogg's change in marketing scheme would largely prevent Kaloti from being able to resell the Kellogg products as a secondary supplier, is not a matter that was dealt with in the contract, nor would one expect it to be dealt with in the contract.

¶ 46. Additionally, this limited fraud in the inducement exception to the economic loss doctrine serves the policies underlying that doctrine. First, the narrow fraud in the inducement exception applied here maintains the fundamental distinction between tort law and contract law. Matters that are expressly or implicitly dealt with in the contract, such as the performance or the quality or character of the goods sold, still must be addressed by contract law. *See Daanen,* 216 Wis. 2d at 404 (noting that "the individual limited duties implicated by the law of contracts arise from the terms of the agreement between the particular parties").

¶ 47. However, "Wisconsin has a long-standing principle that parties need a background of truth and fair dealing in commercial relationships." *Van Lare,* 274 Wis. 2d 631, ¶ 30. Where the matter in question falls outside the contract, courts should be able to address a party's failure to act honestly with tort law, even if the parties are engaging in a commercial transaction. *See Digicorp,* 262 Wis. 2d 32, ¶ 36 (observing that "a party engage[ed] in fraud should not be allowed to hide behind the protections of the economic loss doctrine"); *see also Budgetel Inns, Inc. v. Micros Sys., Inc.,* 34 F. Supp. 2d 720, 724–25 (E.D. Wis. 1999).

¶ 48. Second, the limited fraud in the inducement exception adopted today promotes the economic loss doctrine's goal of protecting parties' freedom to contract. As to the terms of the contract, as well as those matters that one would expect to be addressed in contract terms, parties are expected to negotiate and will be held to their agreements, as required by the law of contract. *See Daanen,* 216 Wis. 2d at 407 ("[I]t is more appropriate to enforce [commercial parties'] bargain than to allow an end run around the bargain through tort law." (quotation omitted)).

¶ 49. Tort law will apply only under circumstances, such as the one allegedly before us, where one party induces another to enter into a contract by representing (or failing to disclose) a fact that would be material to the other party's decision to enter into the contract, but that concerns matters extraneous to the contract's terms.

¶ 50. Finally, the economic loss doctrine is meant to encourage "the party with the best understanding of the attendant risks of economic loss, the commercial purchaser, to assume, allocate, or insure against" such risk. *Daanen,* 216 Wis. 2d at 410. However, where, as here, the purchaser's risk of loss is precipitated by the seller's intentional misrepresentation prior to execution of the contract, and that risk concerns matters extraneous to the contract, it is actually the seller who has the best understanding of the attendant risk of economic loss. The purchaser should not be expected to assume, allocate or insure against the risk of the seller's intentional lie or material omission in these limited circumstances.

¶ 51. For the foregoing reasons, we conclude that a narrow fraud in the inducement exception to the economic loss doctrine applies in the present case and that, as the allegations made by Kaloti satisfy that exception, Kaloti's claim of intentional misrepresentation is not barred by the economic loss doctrine.

## III. CONCLUSION

¶ 52. Based solely on Kaloti's allegations, we conclude that Kellogg and Geraci had a duty of disclosure that they failed to satisfy, thereby providing a basis for Kaloti's intentional misrepresentation claim, and that Kaloti's intentional misrepresentation claim is not barred by the economic loss doctrine. Therefore, we reverse the circuit court's decision to dismiss Kaloti's amended complaint, and we remand for further proceedings.

*By the Court.*—The order of the Waukesha County Circuit Court is reversed and the cause remanded.

¶ 53. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I write separately for two reasons.

¶ 54. First, I write to highlight what is an expansion, without full discussion and recognition of its implications, of this court's decision in *Ollerman v. O'Rourke Co.*[1] The majority opinion in this case extends a duty to disclose to all business transactions, well beyond the residential real estate context in which a duty was imposed in *Ollerman*. The majority opinion

---

[1] *Ollerman v. O'Rourke Co.,* 94 Wis. 2d 17, 288 N.W.2d 95 (1980).

also extends a duty to disclose in business transactions beyond the boundaries set forth in the Restatement (Second) of Torts § 551.[2]

¶ 55. Second, I write to state that although I agree with the majority opinion's bottom line that the economic loss doctrine should not bar Kaloti's inten-

---

[2] Restatement (Second) of Torts § 551 (1977) provides as follows:

§ 551. Liability for Nondisclosure

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

tional misrepresentation tort claim against Kellogg and Geraci, I disagree with the majority opinion's rationale and its adoption of "a narrow fraud in the inducement exception" like that established in the Michigan *Huron Tool* case[3] and explained in the lead opinion in *Digicorp*.[4]

¶ 56. For many years Wisconsin law has recognized that one who intentionally deceives another with the intent and effect of inducing reliance to the other's detriment will be liable in tort.[5] "Yet the economic loss doctrine, in its more aggressive tort-devouring strains, [is being held] to trump this fundamental common law precept."[6] Fraud is fraud and if proved is a good tort claim. In principle or in practice, the *Huron Tool* fraud exception to the economic loss doctrine just doesn't work.

## I

¶ 57. The majority opinion imposes a duty to disclose in business transactions that is well beyond the residential real estate context in which a duty to disclose was imposed in the *Ollerman* case and is well beyond our caselaw. The majority opinion also imposes

[3] *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541 (Mich. Ct. App. 1995).

[4] *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 91, 262 Wis. 2d 32, 662 N.W.2d 652.

[5] *See Cotzhausen v. Simon*, 47 Wis. 103, 106, 1 N.W. 473 (1879); Restatement of Torts §§ 525, 549 (1938); Restatement (Second) of Torts §§ 525, 549 (1977).

[6] Paul J. Schwiep, *The Economic Loss Rule Outbreak: The Monster That Ate Commercial Torts*, Fla. B.J., Nov. 1995, at 34, 36.

a duty to disclose in business transactions beyond the boundaries set forth in the Restatement (Second) of Torts § 551.

¶ 58. The general, traditional common law rule, recognized in Wisconsin, is that in misrepresentation claims, absent a duty to disclose, there will be no tort liability for the failure to disclose.[7] "[S]ilence, a failure to disclose a fact, is not an intentional misrepresentation unless the seller has a duty to disclose."[8] If there is a duty to disclose a fact, a party's failure to disclose is treated in the law as the equivalent of an affirmative misrepresentation of the nonexistence of the fact.[9]

¶ 59. In *Ollerman,* this court declared that "a subdivider-vendor of a residential lot has a duty to a 'non-commercial' purchaser to disclose facts which are known to the vendor, which are material to the transaction, and which are not readily discernible to the purchaser."[10] *Ollerman* involved a residential real estate transaction between a sophisticated seller and an unsophisticated buyer new to the area.[11] The buyer made an offer to purchase a vacant lot on which the buyer planned to build a residence, and the seller, a real estate development corporation, knew that an underground well was on the property but failed to disclose that information to the buyer. When the excavation started, the well was uncapped and water released. The

---

[7] *Lecic v. Lane Co.,* 104 Wis. 2d 592, 604, 312 N.W.2d 773 (1981); *Southard v. Occidental Life Ins. Co.,* 31 Wis. 2d 351, 359, 142 N.W.2d 844 (1966).

[8] *Ollerman,* 94 Wis. 2d at 26 (citing Restatement (Second) of Torts § 551, cmt. b (1977)).

[9] *Ollerman,* 94 Wis. 2d at 26.

[10] *Id.* at 42.

[11] *Id.* at 21.

released water added costs to the construction of the residence and caused other damage. The buyer sued for intentional misrepresentation; the defendant argued that it had no duty to disclose the existence of the well on the property.

¶ 60. The court in *Ollerman* discussed § 551 of the Restatement (Second) of Torts as the embodiment of several situations in which courts, at the time of adoption of the Restatement (Second) in 1976, were withdrawing from the traditional rule of caveat emptor (let the buyer beware). *Ollerman* concluded that subsection (1) of § 551 restated the traditional rule "that one who fails to disclose a fact that he knows may induce reliance in a business transaction is subject to the same liability as if he had represented the nonexistence of the matter that he failed to disclose if, and only if, he is under a duty to exercise reasonable care to disclose the matter in question."[12]

¶ 61. The *Ollerman* court then discussed subsection (2) of § 551 of the Restatement (Second) of Torts setting forth the conditions under which a seller has a duty to disclose certain information.[13] The court was careful to highlight subsection (2)(e), noting that the provision "states that a party to a transaction is under a duty to exercise reasonable care to disclose to the other 'facts *basic* to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclo-

---

[12] *Id.* at 36.

[13] *Id.*

sure of those facts.' "[14] The *Ollerman* court acknowledged that this provision was limited to disclosure of "basic facts" to the transaction and that the Restatement differentiated between "basic" facts and "material" facts as follows:

> A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic.[15]

---

[14] *Id.* at 37 (emphasis added), quoting Restatement (Second) of Torts § 551(2)(e), which provides as follows:

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

. . . .

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

At least one court of appeals decision, although citing *Ollerman* for support, applied the "basic" facts standard of this subsection in an employment setting. *See Hennig v. Ahearn*, 230 Wis. 2d 149, 601 N.W.2d 14 (Ct. App. 1999) (applying Restatement (Second) of Torts § 551(2)(e) to impose a duty on a party to a business transaction to disclose a "significant, last-minute revision" that greatly reduced Hennig's compensation under an executive compensation agreement because given the course of dealing between the parties, Hennig could have reasonably expected the disclosure of a revision of a basic term of the contract).

[15] *Ollerman*, 94 Wis. 2d at 38 (citing Restatement (Second) of Torts § 551, cmt. j).

¶ 62. The *Ollerman* court expanded § 551(2)(e) to encompass a duty on the part of a sophisticated real estate vendor selling to an unsophisticated consumer to disclose *material* facts, writing:

> Where the vendor is in the real estate business and is skilled and knowledgeable and the purchaser is not, the purchaser is in a poor position to discover a condition which is not readily discernible, and the purchaser may justifiably rely on the knowledge and skill of the vendor. Thus, in the instant case a strong argument for imposing a duty on the seller to disclose material facts is this "reliance factor." The buyer portrayed in this complaint had a reasonable expectation of honesty in the marketplace, that is, that the vendor would disclose material facts which it knew and which were not readily discernible. Under these circumstances the law should impose a duty of honesty [disclosure] on the seller.[16]

¶ 63. Based on the existence of the duty to disclose in the narrow circumstances presented by *Ollerman,* the court allowed the buyer's intentional misrepresentation claim to go forward.

¶ 64. *Ollerman* represents an expansion of the duty to disclose under the circumstances, in that case, of a consumer sale, from "[t]he traditional legal rule that there is no duty to disclose in an arm's-length transaction [which] is part of the common law doctrine of caveat emptor . . . ."[17] *Ollerman* also represents an expansion of § 551(2)(e) in imposing a duty to disclose *material* facts instead of just *basic* facts.

---

[16] *Id.* at 41–42.

[17] *Id.* at 29. "Under the doctrine of caveat emptor no person was required to tell all that he or she knew in a business transaction, for in a free market the diligent should not be deprived of the fruits of superior skill and knowledge . . . ." *Id.* at 30.

¶ 65. *Ollerman* itself specified that it was a "narrow holding," and in 2004 in *Tietsworth v. Harley-Davidson, Inc.*, which involved the sale of motorcycles, the court reiterated that *Ollerman* was a " 'narrow holding,' premised on certain policy considerations present in non-commercial real estate transactions."[18] In fact, the *Tietsworth* court explained that "it is an open question whether the duty to disclose recognized in *Ollerman* extends more broadly to sales of consumer goods. This is a significant common-law policy issue."[19]

¶ 66. I have attempted to examine numerous cases citing *Ollerman*. Most of the cases involve real estate. In commercial real estate transactions, sometimes the court declares a duty to disclose and sometimes not.[20] Other than in the instant case, *Ollerman* has not been used, as far as I can tell, to extend a duty

[18] *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 14, 270 Wis. 2d 146, 677 N.W.2d 233.

[19] *Tietsworth*, 270 Wis. 2d 142, ¶ 15 (declining to resolve the issue because the parties did not brief the issue of whether to extend *Ollerman*).

[20] *See, e.g., Lundin v. Shimanski*, 124 Wis. 2d 175, 368 N.W.2d 676 (1985) (duty found in real estate transaction where real estate agency misrepresented to the buyer that the house was suitable for use as a rental property); *Kailin v. Armstrong*, 2002 WI App 70, 252 Wis. 2d 676, 643 N.W.2d 132 (duty imposed in commercial real estate transaction; vendor did not disclose that a tenant in the building being sold has a history of delinquent rent payments and was in default); *Ramsden v. Farm Credit Servs. of N. Cent. Wis. ACA*, 223 Wis. 2d 704, 590 N.W.2d 1 (Ct. App. 1998) (duty found in commercial real estate; misrepresentations about availability of clean water on an auctioned dairy farm); *Grube v. Daun,* 173 Wis. 2d 30, 496 N.W.2d 106 (Ct. App. 1992) (duty imposed in the commercial purchase of farm buildings based on affirmative misrepresentations despite an "as is" clause); *Green Springs Farms v. Spring Green Farm Assoc. Ltd. P'ship,* 172 Wis. 2d 28, 492 N.W.2d 392

to disclose material facts outside of the real estate context.

¶ 67. At least two federal courts interpreting Wisconsin law have rejected the application of *Ollerman* to commercial transactions between businesses.

¶ 68. The Seventh Circuit Court of Appeals declined to impose a duty in the context of negligent misrepresentation in *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.*[21] The court wrote: "When two

(Ct. App. 1992) (duty imposed in commercial real estate transaction in which vendor failed to disclose salmonella contamination on the chicken farm being sold); *Ritchie v. Clappier,* 109 Wis. 2d 399, 326 N.W.2d 131 (Ct. App. 1982) (no duty found in commercial lease context, and even if there was, plaintiff did not justifiably rely on representations about quit claim deed).

The court of appeals has dealt with the duty issue in numerous unpublished opinions. *See, e.g., Fulton v. Vogt,* No. 1996AP1972, unpublished slip op. (Wis. Ct. App. June 16, 1998) (no duty because property sold "as is" and no affirmative misrepresentations; commercial real estate purchase of farm land to be used for construction of self-storage facility); *Hlavna v. United Bank,* No. 1986AP535, unpublished slip op. (Wis. Ct. App. Oct. 16, 1986) (duty imposed in commercial real estate transaction; dissent notes that "[t]he majority has used a howitzer to kill an ant."); *Luebke v. Marine Nat'l Bank,* No. 1983AP161, unpublished slip op. (Wis. Ct. App. Sept. 27, 1983) (duty to disclose problems with manufacturing plant; court of appeals declined to address whether *Ollerman* should be extended to commercial real estate transaction); *Smith v. Moore,* No. 1982AP1522, unpublished slip op. (Wis. Ct. App. July 8, 1983) (no duty to disclose in commercial property sale because builder could not have discovered alleged defect); *County of Manitowoc v. Eis,* No. 1980AP1824, unpublished slip op. (Wis. Ct. App. July 8, 1981) (no duty to disclose in county's option of real estate because the parties were in an arm's length transaction).

[21] *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.,* 1 F.3d 621 (7th Cir. 1993).

corporations, with the benefit of counsel, negotiate a commercial transaction at arms length, neither owes nor assumes a duty to disclose information to the other."[22]

¶ 69. Recently, in *Fleming Cos., Inc. v. Krist Oil Co.,* the district court, quoting *Ollerman,* declared that the parties to a business transaction are to "use their faculties and exercise ordinary business sense" and "not call on the law to stand in loco parentis to protect them in their ordinary dealings with other business people."[23]

¶ 70. As I see it, the majority's holding extends beyond the facts in the instant case to impose a duty on parties in commercial transactions to disclose material facts under certain circumstances. Specifically, the majority holds:

> [A] party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.[24]

---

[22] *Badger Pharmacal,* 1 F.3d at 627 (citing *Ollerman,* 94 Wis. 2d at 29–30).

[23] *Fleming Cos., Inc. v. Krist Oil Co.,* 324 F. Supp. 2d 933, 946 (W.D. Wis. 2004).

[24] Majority op., ¶ 20. The majority opinion does not adopt the Restatement (Second) of Torts § 551(2)(e), which imposes a duty to disclose "basic" facts in certain business settings. The majority opinion applies *Ollerman*'s expanded duty to disclose "material" facts.

¶ 71. I conclude that based on the facts before us, the instant case may be shoehorned into the duty to disclose set forth in Restatement (Second) of Torts § 551(2)(e) and that it is not necessary to extend the duty to disclose beyond the Restatement.[25]

¶ 72. For those who favor more disclosure in business transactions rather than less, the majority opinion's expansion of the duty to disclose material facts in commercial transactions will be welcome news. As we said in *Ollerman*, over the years society's attitudes toward good faith and fair dealing in business transactions have undergone (and continue to undergo) significant change from the traditional caveat emptor rule, and this change is reflected in the law.[26]

## II

¶ 73. Accepting that Kellogg had a duty to disclose its change in marketing, I conclude that fraud in the inducement does not fall within the economic loss doctrine. I would adopt a rule that the tort action of fraud is outside the reach of the economic loss doctrine. A rule that actionable fraud precludes application of the economic loss doctrine makes it easy for defendants to foresee that they will be liable for material representations.

¶ 74. I depart from the majority opinion because it adopts a "narrow fraud rule," which, as I view it, defies consistent and principled application. After all, how can parties allocate, insure against, or otherwise assess risk attendant to a contract, all goals the economic loss doctrine strives to foster, when one party is

---

[25] The duty to disclose is a question of law rooted in policy consideration. *Ollerman*, 94 Wis. 2d at 27–28.

[26] *Ollerman*, 94 Wis. 2d at 30.

intentionally misled by affirmative misrepresentations or by a breach of a duty to disclose material facts by another party?[27] Everyone knows the common sense answer: they can't.

¶ 75. A tort remedy should be available when the tortious conduct harms commerce. A fraud action advances the public interest in deterring misrepresentations. Not only do the parties want a transaction free of fraud, but the State has an interest in ensuring a fraud- and deceit-free business atmosphere. If fraud claims are enforced, parties will be more confident in the terms of the contracts into which they enter.[28] In a valid fraud action for intentional misrepresentation, we have less concern about the cost and uniformity of contractual relationships and extended liability for the manufacturer.

¶ 76. As I stated in my dissent in *Tietsworth:*

> Allowing a fraud in the inducement exception to the economic loss rule for intentional false statements made prior to a contract in a consumer purchase preserves a distinction between tort law and contract law and fosters the values of each. It maintains the value of contract by ensuring that consumers are in a position to make intelligent decisions in allocating the risk of loss, thereby increasing the likelihood that losses can be resolved in contract. It furthers the purposes of tort law by sustaining a financial deterrent for those who intentionally misrepresent their goods.

---

[27] Alternatively, as one court has articulated: "How can parties freely allocate risk if they cannot rely on the opposite party to speak truthfully during negotiations regarding the subject matter of the contract—if they cannot tell what is a lie and what is not?" *Budgetel Inns, Inc. v. Micros Sys., Inc.,* 8 F. Supp. 2d 1137, 1148 (E.D. Wis. 1998).

[28] *Robinson Helicopter Co., Inc. v. Dana Corp.,* 102 P.3d 268, 275 (Cal. 2004).

A fraud in the inducement exception to the economic loss rule for intentional false statements made to consumers is founded on the tort of intentional misrepresentation, a tort action protecting intangible economic interests. This tort action is separate and distinct from the duty created solely by contract. "[T]he interest protected by fraud is a plaintiff's right to justifiably rely on the truth of a defendant's factual representation in a situation where an intentional lie would result in loss to the plaintiff." An overextension of the economic loss rule drowns fraudulent misrepresentation claims in a sea of contract.

What kind of "freedom of contract" and "ability to assess and insure against the risk" is being fostered or protected when a party to a contract commits an intentional tort in inducing a contract that causes monetary loss to another party? On what basis can we say that an individual consumer does not need the tort remedy of intentional misrepresentation against a manufacturer?[29]

¶ 77. The California Supreme Court recently acknowledged that it is impossible for parties to allocate risk when fraud is involved:

A breach of contract remedy assumes that the parties to a contract can negotiate the risk of loss occasioned by a breach. "[W]hen two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach. The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks.

---

[29] *Tietsworth,* 270 Wis. 2d 146, ¶¶ 69–71 (Abrahamson, C.J., dissenting) (citation omitted).

Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law."[30]

¶ 78. Not only is the *Huron Tool* fraud rule deficient as a matter of principle, it is inherently defective because it cannot be applied in a principled way. The fraud rule with which the majority opinion is enamored is as follows: If the fraud is "extraneous" to the contract, the economic loss doctrine will not bar the plaintiff's tort claims. If the fraud is "interwoven" with the contract, the economic loss doctrine applies to bar the plaintiff's tort suit.[31]

¶ 79. Judges cannot agree about the meaning or the application of the *Huron Tool* fraud exception. "Critics contend that the exception is dead on arrival because almost all actionable misrepresentations will deal with the contract matter, and thus be 'interwoven,' for purposes of the *Huron Tool* exception and therefore, barred by the economic loss doctrine."[32] The *Huron Tool* rule "renders the fraud in the inducement excep-

---

[30] *Robinson Helicopter Co.,* 102 P.3d at 275 (quoting *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,* 869 P.2d 454 (Cal. 1994)).

[31] Majority op., ¶ 42. Fraud that is "interwoven" "relate[s] to the breaching party's performance of the contract and do[es] not give rise to an independent cause of action in tort." Majority op., ¶ 34 (citing *Huron Tool,* 532 N.W.2d at 545). For the fraud to be "extraneous to the contract" it must be "[distinguishable] from the terms of the contract and warranty." Majority op., ¶ 35 (citing *Huron Tool,* 532 N.W.2d at 546).

[32] John J. Laubmeier, *Demystifying Wisconsin's Economic Loss Doctrine,* 2005 Wis. L. Rev. 225, 239–240 (citing *Budgetel Inns,* 8 F. Supp. 2d at 1146).

tion a nullity" as this limitation "is so broad that it swallows the exception whole."[33]

¶ 80. As one court noted:

> In all fraud in the inducement cases the alleged fraudulent misrepresentations will either concern the quality and characteristics of the underlying subject matter, because that is the definition of "fraud in the inducement itself." . . . Because the contract concerning the "particular thing" will always be considered "interwoven" with the deceit under *Huron,* fraud in the inducement claims will always be barred. The tort, after all, is inducing someone to enter into a contract, so to say it does not apply where the tort involves the contract or its subject matter analytically makes no sense.[34]

¶ 81. In applying the *Huron Tool* rule to the instant case, I conclude that Kellogg's fraudulent misrepresentations can easily be classified as either extraneous or interwoven.[35]

¶ 82. The majority opinion concludes that Kellogg's change in marketing strategy was "extraneous to" the contract. Why? Because the fraud did "not regard the quality or character of the NutriGrain and Rice Krispie Treat products that Kellogg sold to

---

[33] *Budgetel Inns,* 8 F. Supp. 2d at 1146.

[34] *Id.* at 1147.

[35] How can one possibly know in the instant case whether the fraudulent misrepresentations were interwoven with the contract? The contract is not part of this record. I would think a court would need to read the contract to know what is interwoven with it and take testimony about the contract from the parties to determine what matters are interwoven with or extraneous to the contract. To boldly assert, as the majority opinion does, what the contract does and does not provide is puzzling.

Kaloti."[36] Furthermore, the "alleged misrepresentation concerned a matter whose risk was never contemplated to be a part of the contract to purchase Kellogg's products."[37] Under the approach the majority opinion takes, marketing has nothing to do with the parties' sale and purchase of the products, so the fraud is extraneous to the contract and the economic loss doctrine does not apply.

¶ 83. An alternative view of the instant case applying *Huron Tool* is that Kellogg's marketing strategy is interwoven with the contract. When Kaloti agreed to purchase the products from Kellogg, Kaloti thought it was buying a product Kaloti could sell to stores (as it had in the past) and that Kellogg would continue its marketing practices so as not to interfere with Kaloti's resale of the products purchased. Kellogg's change in marketing related to the performance of the contract; performance of the contract is generally viewed as interwoven with the contract.

¶ 84. To help determine how central Kaloti's ability to sell the product was to the contract, imagine that during contract negotiations the alleged fraudulently omitted information was disclosed. Here is how the conversation might have gone:

> **Kaloti**: I'd like to order $124,000 in tasty treats for the upcoming quarter for sale to the stores to which you know I sell.
>
> **Geraci/Kellogg**: Sure, no problem. Just send in your check. We'll ship the product right away.
>
> **Kaloti**: Thanks. Talk to you next quarter.
>
> **Geraci/Kellogg**: Oh wait, one more thing. We're aware you sell the treats to various large stores, but Kellogg

---

[36] Majority op., ¶ 45.
[37] Majority op., ¶ 45.

and Keebler just merged and we're going to sell the exact same product you sell to the exact same large stores to which you already sell. The market to which you have sold in the past is now probably closed. We are not sure where you will sell that $124,000 in tasty treats.

**Kaloti**: Uh . . . .

¶ 85. How would Kaloti respond? "No problem!" Or, "What are you smoking?" Or, "How much weight do you think I'll gain if I have to eat them all myself?" Or, "No deal!"

¶ 86. These are perishable products. I am confident that Kaloti would not have agreed to purchase the products at all, or at least not for the same amount of money, knowing that it might not be able to sell the product. Quite simply, the ability to sell a product is interwoven with the commercial purchase of that product for resale, especially as here given the parties' pattern of dealing.[38]

¶ 87. Because the *Huron Tool* exception does not further the policies justifying the existence of the economic loss doctrine and cannot be applied in a principled way, I do not join the majority in adopting this exception. I would say fraud is fraud and a tort action lies when the elements of fraud are proved in a commercial contractual setting. In the instant case a fraud action lies, and I therefore concur.

¶ 88. For the reasons set forth, I concur.

¶ 89. I am authorized to state that Justices ANN WALSH BRADLEY and LOUIS B. BUTLER, JR. join this opinion.

---

[38] *Budgetel Inns*, 8 F. Supp. 2d at 1147.