In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3339

STOUGHTON LUMBER COMPANY, INC.,

*Plaintiff-Appellee,*

*v.*


PETER A. SVEUM,

*Defendant-Appellant.*


Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cv-00789-wmc — **William M. Conley**, *Chief Judge.*


ARGUED APRIL 17, 2015 — DECIDED JUNE 4, 2015


Before POSNER and WILLIAMS, *Circuit Judges*, and WOOD, *District Judge*.[*]

POSNER, *Circuit Judge*. Peter Sveum and his wife declared bankruptcy under Chapter 7 of the Bankruptcy Code. Sveum had since 1989 owned with his brother a home-building

---

[*] Hon. Andrea R. Wood of the Northern District of Illinois, sitting by designation.

company in Wisconsin named Kegonsa Builders, Inc. One of Kegonsa's creditors, Stoughton Lumber Company, had sued Sveum along with his brother and their company under Wisconsin law, alleging breach of contract and theft by contractors. The suit had been settled for approximately $650,000 (plus some other consideration, which however we can ignore). Sveum violated the settlement agreement and Stoughton sued again and this time obtained a default judgment for $589,638.10. Unable (we assume) to pay the judgment, Sveum filed for bankruptcy, and asked the bankruptcy judge to discharge his debts, including the debt to Stoughton, on the ground that he lacked the wherewithal to pay them. Stoughton responded by filing an adversary proceeding in the Sveums' Chapter 7 bankruptcy, claiming that Sveum's debt to Staughton was not dischargeable. The bankruptcy judge agreed and denied discharge, and was affirmed by the district court, from which Sveum appeals to us.

The Bankruptcy Code forbids discharge of a debt "for fraud or defalcation while [the person or firm committing it is] acting in a fiduciary capacity [in relation to the victim of the fraud or defalcation]." 11 U.S.C. § 523(a)(4). "Defalcation" refers to the misappropriation of funds entrusted to one—a form of embezzlement. It differs from fraud in not requiring a false statement. "'Defalcation,' as commonly used … can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity." *Bullock v. Bankchampaign, N.A.*, 133 S. Ct. 1754, 1760 (2013). Fraud and defalcation are interchangeable in the present case, because Sveum, as we'll see, made many false statements, though they were not made directly to Stoughton but rather seem to have been intended to enable Sveum to pay other creditors ahead of

Stoughton from money, held by Sveum's company in trust for Stoughton, to which Stoughton alone was entitled.

The specific wrong, which is both fraud and defalcation, alleged by Stoughton is what Wisconsin law calls "theft by contractors." Wis. Stat. § 779.02(5). As explained in the statute, "all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid … . The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated." See also Mark Hinkston, "Wisconsin's Construction Trust Fund Statute: Protecting Against Theft by Contractor," www.wisbar.org/newspublications/wisconsinlawyer/pages/article.aspx?Volume=78&Issue=5&ArticleID=1000 (visited May 10, 2015).

Between 2008 and 2011 Kegonsa bought hundreds of thousands of dollars' worth of building materials from Stoughton, on credit, for 34 homes that Kegonsa built and sold. A portion of the money received for those sales became by operation of the Wisconsin statute that we just quoted a trust fund that though administered by Kegonsa could be used only to pay for materials used in the construction of the homes, such as the building materials bought from Stough-

ton on credit. Rather than segregating the revenues held in trust, Kegonsa deposited all its revenues in a single bank account from which it paid all its bills. Segregation of the trust funds was not required either by the statute or, as far as we're aware, the case law; but while Kegonsa was therefore free to commingle the funds with other moneys, it had to preserve intact the assets of the trust fund for Stoughton. It didn't.

Sveum argues that he committed an innocent mistake by failing to pay Stoughton what Kegonsa owed it—that although he was aware of the statute he didn't know about its provision for a trust fund, and acting as he did out of ignorance did not commit fraud or defalcation and therefore should not have been denied his discharge. The bankruptcy judge who presided at Stoughton's adversary proceeding didn't believe Sveum's protestations of innocence. An educated person with a college degree in business administration, Sveum had been in the building business for forty years and had supervised the construction and sale of hundreds of homes. Evidence presented in the adversary proceeding indicated that the statute's trust-fund requirement was generally known in the industry. In addition, it was inconceivable that Sveum didn't know that proceeds of the sale of a home or other building have to be held in trust for subcontractors of the builder. It is vital knowledge for a builder, because a subcontractor who isn't paid can sue the buyer of the building, who can in turn sue the builder. Apart from such litigation risk, a builder who gains a reputation for exposing his customers to suit by subcontractors will have trouble getting hired to build homes. That's why prime contractors routinely insist on lien waivers from their subcontractors (that is, commitments by the subcontractors not to impose any liens

on the buildings they're working on, which would make the owner liable), and why the Wisconsin legislature provides subcontractors with the substitute protection of a trust. See Hinkston, *supra*.

It's not just that Sveum should have known that Kegonsa as a prime contractor in the construction and sale of homes was required to hold its revenues from sales of the homes in trust until the firm's subcontractors, such as Stoughton, were paid; it was a permissible inference that he did know, or at the least that he was playing ostrich—that is, that he suspected that he was violating the law but avoided confirming his suspicion in order to preserve a patina of innocence. That is what is sometimes called—besides "playing ostrich"— "conscious disregard" of risk, "willful blindness," or "gross recklessness," *Bullock v. Bankchampaign, N.A.*, *supra*, 133 S. Ct. at 1759, but is more perspicuously understood as knowing that there is a risk of serious harm and that it can be averted at reasonable cost, yet failing to act on that knowledge. Recklessness as we have just defined it is a mental state on which a finding of fraud can be based. *Id*. at 1759–60; *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008); *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 211 (Wis. 2005).

Evidence of Sveum's recklessness abounds. Stoughton had first sued him for theft by contractor in January 2011. Sveum admitted making no effort to apprise himself of the obligations imposed by the statute until July or August of the following year even though he was represented by counsel in the litigation. And he represented on owner affidavits that all his subcontractors had been paid in full. An owner's affidavit is a sworn statement by a seller of real estate (Sveum) concerning the property being sold. Sveum swore

in these statements that all subcontractors who had supplied materials to construct a building on the property had been paid in full. (Title companies generally require owners' affidavits because they're ensuring the home buyer against the risk that someone else owns the property, and subcontractors who aren't paid in full may have liens on the property, which impair its value to its buyer.) Sveum knew he was swearing falsely.

He also submitted draw requests (requests for partial prepayment from home buyers or the buyers' mortgagees) in which he said that the subcontractors who had supplied materials for a building project would be paid a specified amount from each draw. That was another false representation.

AFFIRMED