COURT OF APPEALS
DECISION
DATED AND FILED

**January 23, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP944**

STATE OF WISCONSIN

Cir. Ct. No. 2022CV155

IN COURT OF APPEALS
DISTRICT IV

ANN K. CADY, BETH L. CORNING, AND
CARON G. ROESLER,

   PLAINTIFFS-RESPONDENTS,

 V.

MATTHEW C. O'MALLEY,

   DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Sauk County: WENDY J.N. KLICKO, Judge. *Affirmed*.

Before Graham, P.J., Kloppenburg, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Matthew O'Malley appeals a circuit court order that enforced a settlement agreement he made with his sisters regarding the disposition of real estate and a family-owned corporation, and that dismissed this litigation with prejudice pursuant to that agreement.  We reject O'Malley's arguments and affirm the order of dismissal.

## BACKGROUND

¶2    The plaintiffs, Ann Cady, Beth Corning, and Caron Roesler, and the defendant, Matthew O'Malley, are siblings who shared ownership of real estate and a family-owned corporation called Johnson-O'Malley, Inc.  We refer to Cady, Corning, and Roesler collectively as the "sisters"; to the three sisters and O'Malley collectively as the "siblings"; and to Johnson-O'Malley, which is not a party in this litigation, as the "corporation."

¶3    When this lawsuit was initiated, each of the siblings owned an undivided one-fourth interest in a parcel of residential real estate in the Village of Lake Delton.  Each of the siblings also owned one fourth of the shares of the family corporation, meaning that the siblings were its sole shareholders.  For its part, the corporation owned a parcel of commercial real estate that was adjacent to the residential parcel.

¶4    In or around 2021, some or all of the siblings decided that the residential and commercial parcels should be sold, ideally to a single buyer.  At some point as they prepared for a sale, the communication between the siblings broke down and O'Malley, who had been living in a house on the residential property, refused to allow his sisters access to that property.

2

**The Pleadings**

¶5      In April 2022, the sisters initiated this lawsuit and O'Malley counterclaimed.  As we discuss in more detail below, both sides generally agreed that the real estate should be sold, and both sides asked for a judicially ordered sale of one or both parcels pursuant to WIS. STAT. § 842.02(2) (2023-24).[1] However, the sisters and O'Malley disagreed about how the proceeds of the sale should be split between the siblings.

¶6      In their complaint, the sisters sought an injunction against O'Malley that would grant the sisters access to the residential property and require O'Malley to move out.  They also sought an order for the judicial sale of the residential property, which would be followed by a court-ordered equitable division of the proceeds.  According to the sisters' request for relief, the distribution of sale proceeds to O'Malley should be reduced based on "contributions" that the sisters made to the residential real estate and reductions in the value of the real estate that the sisters attributed to O'Malley, and also based on the theory of unjust enrichment because O'Malley had been "living rent free" in the house on the residential property.

¶7      In his answer, O'Malley denied that he owed any rent for the residential property.  He affirmatively alleged that any reduction in its value was due to mismanagement by his sisters.

¶8      O'Malley also filed two counterclaims: one for unjust enrichment and a second for a judicial sale.  As for unjust enrichment, O'Malley alleged that

---

[1]  All references to the Wisconsin Statutes are to the 2023-24 version.

the sisters had been unjustly enriched by the efforts he had undertaken to manage the residential property and the business on the commercial property, and he sought the value of the services that he had provided for both properties. As for the request for a judicial sale, O'Malley sought the sale of not only the residential property but also the commercial property, and he took the position that the net proceeds should be divided equally among the parties.

¶9 In their response to the counterclaims, the sisters denied that O'Malley was entitled to any compensation. They affirmatively alleged that he had taken insurance money for the residential property for his own personal use and operated his own business out of the commercial property.

¶10 In February 2023, O'Malley's first set of attorneys moved to withdraw as counsel, citing a substantial breakdown in communication on the substantive issues relating to the case. The circuit court did not enter an order allowing the attorneys to withdraw until a month later, after the siblings had entered into a settlement agreement but before they followed through on the settlement by asking the court to dismiss the litigation. As discussed below, O'Malley would go on to retain and then discharge two more sets of attorneys during the course of the post-settlement phase of the litigation.

**The Settlement**

¶11 The siblings entered into a written settlement agreement on March 3, 2023. As we understand it, a significant impetus for the agreement was that there had been an offer to purchase the residential and commercial real estate and some or all of the siblings wanted to accept that offer. As we describe in greater detail below, the written settlement agreement memorializes an agreement to sell the real estate, to resolve the claims between the siblings, to distribute the proceeds of the

4

real estate sale, to transfer full ownership of the corporation to O'Malley, and to dismiss this litigation. The siblings and the corporation were party to the agreement, which was signed on March 3, 2023, by each of the siblings and by one of the sisters, Ann Cady, on behalf of the corporation as its president. We sometimes refer to the siblings and the corporation collectively as the "settling parties."

¶12   As for the real estate, the settlement agreement provided that both parcels would be sold pursuant to the terms of the purchase offer, which was incorporated into the agreement.[2]   The agreement further provided that, if the closing did not occur "due to factors out of the control of the parties," the settlement agreement would be "null and void in its entirety."

¶13   The settlement agreement resolved various disputes between the siblings about who was owed money and who would be responsible for certain corporate debts, and it also provided that O'Malley would assume sole ownership of the corporation. For his part, O'Malley agreed that upon the closing of the real estate sale, he would make a payment to Cady to pay off a personal loan, he would resolve a specified judgment and certain debts that constituted liens on the real estate, and he would be responsible for specified utility bills and certain credit card and corporate debts. For the sisters' part, they agreed to make a payment to O'Malley, to pay certain utility and legal bills owed by the corporation, and to

---

[2]   The offer to purchase and its addendum were not included in the documents filed in the record. There is no argument that the details of those documents are material to this appeal.

surrender their roles, shares, and interests in the corporation to O'Malley, "thus giving O'Malley 100% … ownership."[3]

¶14    The settlement agreement also included a mutual release.  Generally speaking, the settling parties released each other from "any and all liability, claims, counterclaims, damages, remedies, and causes of action, of any kind or nature, … known or unknown, that existed or may have existed on or before the date of this Agreement relating to the Subject Properties, the Corporation, or the relationship between the Parties."  The release was qualified in that it did not "bar any claim of the Corporation or [the sisters] against O'Malley for debts incurred on behalf of the Corporation that are unknown to the Corporation or [the sisters]," nor did it "bar any claim of the Corporation or O'Malley against [the sisters] for debts incurred on behalf of the Corporation that are unknown to the Corporation or O'Malley."

¶15    Each of the settling parties expressly acknowledged that the written settlement agreement constituted the "entire agreement and understanding between the Parties."  They further acknowledged that no other party had "made any statement, promise, representation, or warranty whatsoever … not contained within this Agreement to induce [the settling party] to execute this Agreement," and that they had not executed the agreement "in reliance on anything not contained" in the agreement.

¶16    Finally, the parties agreed to dismiss the lawsuit.  The settlement agreement provided: "Upon the complete execution of this Agreement, which

---

[3] The settlement agreement also included provisions about how some personal property would be distributed, but those provisions are not at issue here.

6

contemplates the closing of the Sale, the Parties shall then file a stipulation and proposed order for dismissal of the Lawsuit with the Court."

¶17     In mid-March 2023, the sisters' attorney filed a letter to inform the circuit court of the settlement.  Counsel anticipated that a stipulation and order to dismiss would be filed in May.  However, no stipulation was forthcoming.  Meanwhile, as noted, after receiving the notice of settlement, the court allowed O'Malley's first set of attorneys to withdraw.

## The Closing

¶18     The closing of the real estate transaction occurred on June 15, 2023, with the two parcels of real estate selling for $1,000,000.  Prior to the closing, the parties worked with a closing agent to determine how the sale proceeds would be divided.  Each of the siblings would receive an equal share of the sale proceeds, which would then be adjusted to account for the other payments and liabilities that were resolved in the settlement agreement.  For his part, O'Malley's share of the sale proceeds was adjusted upward to account for the settlement payment from the sisters, and then downward to account for the loan payoff to Cady and the payments of other debts and liabilities that O'Malley assumed in the settlement agreement.  A "closing statement" prepared by the closing agent memorialized the dollar value of the distributions to each of the siblings, and the statement was signed by each of the siblings and by Cady on behalf of the corporation.

¶19     The closing agent also prepared tax documents (Form 1099-S) for the siblings and the corporation.  The 1099s reflected that each of the siblings received a quarter share of the sale proceeds (that is, $250,000) from the real estate transactions and that the corporation received $0.  Each of the siblings signed his or her 1099, and Cady signed the 1099 for the corporation.  When later questioned

7

at an evidentiary hearing, the closing agent testified that the direction on how to distribute the proceeds came from meetings with the siblings, and the siblings' agreement was evinced in the signed closing statement and the 1099s.

¶20 Following the closing and the distribution of the sale proceeds, the sisters' attorney prepared documents that would transfer the sisters' shares of the corporation to O'Malley and a stipulation that would dismiss the lawsuit. O'Malley refused to accept the shares unless the sisters turned over corporate documents and provided an "accounting" of the corporation's finances. The sisters provided documents, but O'Malley refused to accept them and refused to sign the stipulation for dismissal.

**The Motion to Enforce the Settlement Agreement**

¶21 In July 2024, the sisters filed a motion asking the circuit court to enforce the settlement agreement and dismiss the lawsuit. Although the motion was styled as a "motion to dismiss," it was not a motion based on a defense set forth in WIS. STAT. § 802.06(2)(a), nor was it a motion for summary judgment. Instead, it was effectively a motion seeking specific performance of the settlement agreement, which would result in the dismissal of the lawsuit.

¶22 In the motion, the sisters represented that all of the terms of the settlement agreement "have been satisfied or resolved except that" O'Malley had "failed to accept" ownership of the corporation. The sisters represented that they had attempted to transfer their shares to O'Malley, but he refused to accept them. The sisters also represented that they had offered, in the alternative, to dissolve the corporation. However, O'Malley had "not agreed to any proposed solution and ha[d] not proposed any solution to dismiss the matter."

¶23 O'Malley, who was at this time represented by a second set of attorneys, filed a brief opposing dismissal. In that brief, O'Malley argued that the sisters had failed to establish that two of the settlement agreement's "conditions [of] dismissal … ha[d] been met." More specifically, he asserted, "the allocation of liabilities for capital gains taxes on the sale proceeds" were "at variance from the terms of the closing," and the sisters had not provided "the books, accounts and records of [the corporation] in up-to-date and merchantable form." On the latter point, O'Malley asserted, he was uncertain whether the documents that had been turned over were complete, and he objected to "being asked to take delivery of corporate records and indicia of ownership with no opportunity to verify their completeness or accuracy."

¶24 Additionally or perhaps in the alternative, O'Malley argued that the terms of the settlement agreement were "so contingent" that the agreement "is of questionable enforceability," and also that the agreement was "not sufficiently definite to be enforced." O'Malley asserted that the parties should have included additional terms in their agreement—"[t]he real estate closing and its subsequent tax reporting should have been defined by precise terms" in the settlement agreement, and "[t]he corporate assets should have been inspected, exceptions to their suitability noted, and the problems cured," presumably prior to executing the settlement agreement.

¶25 A motion hearing was scheduled for September 2024. By that time, O'Malley had discharged his second set of attorneys and was represented by a third set. There is no transcript of the September 2024 hearing in the record, nor is there any written order memorializing the results of that hearing. Based on later representations by the circuit court and the siblings, we understand that O'Malley raised concerns about the corporate documents he had received, and the sisters

offered to provide all documents in their possession. Consistent with that offer, the court ordered the sisters to provide the documents and ordered O'Malley to accept them, and it gave O'Malley 60 days to review the documents and to decide whether he was maintaining his objection to dismissal of the lawsuit.

¶26 In December 2024, O'Malley's third set of attorneys wrote to inform the circuit court that O'Malley had reviewed the documents that had been provided and continued to object to the lawsuit being dismissed. The letter stated that, "[a]mong other things, the documents evidence that the [sisters] failed to comply with material terms of the settlement agreement, and that those failures may constitute grounds for invalidation or rescission of the parties' agreement." The letter did not identify any particular term that the sisters failed to comply with, nor did it identify any facts that would support invalidation or rescission of the settlement agreement. The letter instead asked for a status conference to establish "an appropriate scheduling order addressing additional discovery (to the extent the court will permit it) and briefing."

¶27 At the same time, O'Malley's third set of attorneys moved to withdraw from the case, citing "[f]undamental disagreements" that had "arisen between [O'Malley] and his counsel such that continued representation would be unreasonably difficult …." Counsel's motion asserted that "[w]ithdrawal may be accomplished without material adverse effect to the defendant, the other parties to this matter, or the [circuit] court." The court did not at that time enter an order allowing the third set of attorneys to withdraw.

¶28 Shortly thereafter, O'Malley filed a pro se motion and a pro se brief opposing the pending motion to enforce the settlement agreement. In the pro se motion, O'Malley cited his right to self-representation and asked the circuit court

to allow him to proceed pro se. In so doing, he "affirm[ed] that he underst[ood] the responsibilities and obligations associated with self-representation, including compliance with court rules and procedures." O'Malley also asked the court to "[a]dmit and consider" his pro se brief as a supplement to the brief that had been previously filed by his second set of attorneys.

¶29     O'Malley's supplemental brief was lengthy and at times difficult to track, but we summarize its arguments as we best understand them.[4]  According to O'Malley, the settlement agreement was "invalid" because O'Malley had not meaningfully participated in the negotiation; because the sisters and their attorney unilaterally imposed certain terms; because the sisters' attorney had previously represented the corporation which created a "conflict of interest"; and because O'Malley signed the agreement under "undue influence" or "duress." Dismissal pursuant to the settlement agreement was also "premature" because the agreement contemplated that the lawsuit would not be dismissed until "execution" of the agreement was "complete," and that had not yet occurred because corporate ownership had not been transferred to O'Malley.

¶30     O'Malley's supplemental brief also asserted that he was unwilling to accept the transfer of his sisters' shares in the corporation because there were a number of "unresolved issues" about how the corporation had been managed that

---

[4] By attempting to summarize the arguments O'Malley made in his pro se motion and supplemental brief in opposition, we do not mean to suggest that the circuit court was required to consider them, given that O'Malley was represented by counsel when the motion and brief were filed. *See Johnson v. Johnson*, 2016 WI App 60, ¶26, 371 Wis. 2d 388, 885 N.W.2d 603 (declining to consider a pro se motion filed by a litigant when the litigant was represented by counsel at the time of the pro se filing); *State v. Debra A.E.*, 188 Wis. 2d 111, 138, 523 N.W.2d 727 (1994) (addressing the concept of "hybrid" representation, and providing that an appellate court may but need not consider pro se briefs filed by a represented appellant).

11

predated the 2023 settlement, including issues with corporate recordkeeping and transparency. According to O'Malley, the corporate documents that had been provided were inadequate and left lingering questions. Specifically, O'Malley could not verify the sisters' representation that the corporation had no assets after the real estate was sold, nor could he verify whether it had additional undisclosed liabilities that could offset the benefits of full ownership, rendering the settlement agreement "inequitable." Some of the "unresolved issues" that O'Malley identified in his supplement were also the subject of O'Malley's counterclaims, and he argued that he potentially had other unpled claims such as breach of fiduciary duty that he might wish to pursue against his sisters.

¶31    Additionally, O'Malley's supplemental brief presented his concerns about decisions that the sisters had purportedly made after the settlement agreement was signed. One of these decisions had something to do with the preparation of a schedule 5K-1 tax form which, O'Malley asserted, was not consistent with the "property allocation values agreed to and executed at the 15 June 2023 closing." Another decision concerned a purported quit claim of corporate real estate to Sauk County. O'Malley asserted, among other things, that he was entitled to certain disclosures, including a detailed list of all contracts that the sisters entered into on behalf of the corporation since 2020.

¶32    The circuit court scheduled a telephone motion hearing to address the motion to withdraw filed by O'Malley's third set of attorneys. On January 7, 2025, the morning of the hearing, O'Malley filed a pro se motion that appeared to reverse course on his request to represent himself—O'Malley instead asked the court to "delay any subsequent hearings" to give time for "still missing corporate records" to be provided and "to allow [O'Malley] time to secure replacement

12

counsel and to review corporate records necessary to properly respond to the pending matters."

¶33    The telephone motion hearing took place as scheduled on January 7, 2025. The circuit court acknowledged O'Malley's request for additional time to retain replacement counsel and review corporate records, but it expressed concern about the length of time that the case had been pending and the fact that the sisters' attorney planned to leave his law firm after the end of the month. After confirming that all of the corporate documents that had been provided to O'Malley's counsel had been turned over to O'Malley, the court granted counsel's motion to withdraw. The court agreed to postpone the evidentiary hearing on the sisters' pending motion until January 31, but no later, and stated that if O'Malley wanted to be represented by counsel at the hearing, O'Malley would have to retain counsel before the hearing date.

**The Evidentiary Hearing**

¶34    The evidentiary hearing proceeded as scheduled on January 31, 2025. O'Malley had not retained replacement counsel and represented himself.

¶35    At the start of hearing, the circuit court reviewed the posture of the litigation between the siblings, and it identified what had been addressed and what remained to be addressed in the litigation as follows. The sisters' complaint and O'Malley's counterclaim had each sought judicial sale of the real estate, but that relief was not something the court could order given that the real estate no longer belonged to the settling parties. And, although O'Malley had also filed a counterclaim for unjust enrichment, the counterclaim had been resolved through the settlement agreement. Specifically, the siblings had agreed that the disbursements from the real estate sale would "resolve" their competing claims

13

"about the other being unjustly enriched." Accordingly, O'Malley's counterclaim need not be further addressed, assuming that the settlement agreement was enforceable. Under these circumstances, there were no remaining claims or counterclaims in the lawsuit left to adjudicate, and the focus of the evidentiary hearing would be on whether the court should order enforcement of the settlement agreement, which would result in the dismissal of the lawsuit.

¶36 When asked whether he agreed with the circuit court's summary of the remaining issues in the litigation, O'Malley again brought up concerns about missing corporate documents, and the court questioned the sisters' attorney about whether all known corporate documents had been provided to O'Malley. Counsel represented that, based on his conversations with the sisters, all known corporate records in their possession had been turned over, and O'Malley responded that he had not received documents such as "corporate minutes from many major decisions that were made after the settlement agreement." Counsel maintained that the existing records had been turned over, and suggested that O'Malley was raising a different question about whether "corporate records weren't properly kept." Based on this discussion, the court stated that "there isn't anything more for the court to order at this time."

¶37 The closing agent testified at the hearing, and her testimony was consistent with the facts set forth above: all four siblings had agreed to the division of sale proceeds that was represented in the closing statement; the proceeds were disbursed consistent with that statement; and the 1099 tax forms accurately reflected that all of the proceeds were distributed to the siblings and none to the corporation. The closing agent further testified that the siblings all agreed that Cady should sign the paperwork on the corporation's behalf.

¶38   O'Malley also testified at the hearing. Although the circuit court gave some latitude to O'Malley to present his case, the court also sustained objections and redirected O'Malley's testimony when it determined that O'Malley was veering into topics that were irrelevant to the enforceability of the settlement agreement, which was the only remaining issue in the litigation. We describe O'Malley's testimony in some detail, as it provides helpful context to his arguments on appeal.

¶39   During his testimony, O'Malley made a number of admissions about the circumstances surrounding the negotiation and execution of the settlement agreement. Among other things, O'Malley admitted that the siblings had discussed dissolving the corporation as part of the settlement, but that he had specifically asked that the ownership of the corporation be transferred to him instead. He also admitted that he signed the settlement agreement, the closing paperwork, and his 1099; that the real estate had been sold and the proceeds had been disbursed; and that the disbursement of sale proceeds and 1099s were consistent with the settlement agreement. In O'Malley's view, the transfer of ownership was the only portion of the settlement agreement that had not been completed.

¶40   O'Malley further testified that he believed that he was the sole owner of the corporation pursuant to the settlement agreement. However, in his view, ownership "hasn't been properly transferred" because his sisters had not provided a full accounting of its assets and liabilities. When asked to identify a provision in the agreement that required specific documentation to be provided, O'Malley pointed to the provision that stated: "[The sisters] agree at Closing to surrender any and all Johnson-O'Malley roles, shares and interests over to O'Malley, thus giving O'Malley 100% … ownership." As we best understand

O'Malley's testimony, the point he was attempting to convey was that his 100% ownership included ownership of all corporate records and that, "according to Wisconsin business law," the transfer is not complete until records are provided.

¶41 During his testimony, O'Malley also asserted that he had not wanted to agree to the terms of the settlement agreement and was under "undue influence" to sign it. More specifically, he testified that he had wanted the property to be partitioned rather than sold, but he "was told that if [he] didn't sign the agreement" the corporation might lose its liquor license, "the buyer might walk," the lost value "would come out of … [his] ownership proceeds," and the house on the residential property would likely be condemned. When asked how those facts amounted to undue influence, O'Malley testified that the situation "created a sense of urgency that wouldn't be there otherwise."

¶42 O'Malley also testified that, in his view, it was "highly inappropriate" for the corporation to be included as a party to the settlement agreement. According to O'Malley, the corporation had not been included until the sisters' attorney added it as a party to the settlement agreement at the "last minute." O'Malley asserted that the attorney must have been representing the corporation as well as his sisters during the settlement negotiations, and that the attorney continued to represent the corporation after the closing occurred.

¶43 In addition, O'Malley's testimony touched on his concerns about poor corporate recordkeeping practices over a period of 20 years, and he asserted that the corporation might have liabilities that he was unaware of for which he would be responsible.

¶44 Finally, O'Malley also vaguely alluded to events that, he suggested, had occurred after the closing. Specifically, he testified, "my understanding is

they [the sisters, presumably] made a huge shift for their tax benefits that greatly harmed me," and "my understanding is they flipped it and suddenly there was $700,000 put on the corporation that wasn't there." O'Malley did not introduce evidence to support these assertions.

¶45 The circuit court determined that the siblings had voluntarily entered into the settlement agreement, and that it was enforceable. Therefore, the court ordered specific performance of the remaining provisions of the agreement—namely, that all shares of the corporation belonged to O'Malley as of the date of the closing, and the dismissal of the lawsuit.

¶46 The circuit court made the following factual and legal determinations in support of its ruling. The settlement agreement was signed by all of the siblings and by Cady on behalf of the corporation. The agreement contemplated a full resolution of all of the issues in the lawsuit, including the manner in which the sale proceeds would be divided after the closing. All of the events contemplated by the agreement had occurred. The settling parties had all agreed that the numbers in the closing statement were correct, and the proceeds were disbursed according to that statement. The parties also signed the 1099s consistent with their prior agreement.

¶47 The circuit court also determined that the facts that O'Malley testified to regarding a "sense of urgency" did not amount to undue influence or duress. As the court explained, "urgency certainly plays a part in all kinds of business dealings," especially in real estate transactions. However, it "is not a threat" to discuss the "potential outcomes" of not reaching an agreement—it is instead a natural part of the negotiation process, which includes "providing information" so that the parties can make "a reasoned decision … about whether

to go forward or not." If O'Malley had questions about corporate recordkeeping or other matters, he should have resolved his questions before signing the settlement agreement.

¶48 The circuit court entered an order that dismissed all claims and counterclaims with prejudice and ordered that all "roles, shares, and interests [in Johnson O'Malley, Inc.] are transferred from [the sisters] to [O'Malley], giving [O'Malley] 100% ownership effective June 15, 2023." O'Malley appeals.[5]

---

[5] The briefs and appendices filed in this appeal violate various provisions of the rules of appellate procedure found in WIS. STAT. ch. 809.

First, the brief and appendix that the sisters filed and the reply brief and appendices that O'Malley filed do not comply with WIS. STAT. RULE 809.19(8)(bm), which addresses the pagination of appellate briefs and appendices. *See* RULE 809.19(8)(bm) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover"). This rule was amended to its current form in 2021, *see* S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii, and the reason for the amendment is that briefs are now electronically filed in PDF format, and are electronically stamped with page numbers when they are accepted for efiling. The pagination requirements ensure that the numbers on each page of a brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief. Supreme Court Note, 2021, RULE 809.19.

Second, O'Malley's appendices also include some documents that were not filed during the circuit court proceedings and are not included in the record on appeal. We disregard these documents because our appellate review is limited to the record on appeal, which contains only those documents that were presented during the circuit court proceedings. *See State ex rel. Wolf v. Town of Lisbon*, 75 Wis. 2d 152, 155-56, 248 N.W.2d 450 (1977).

Third, although WIS. STAT. RULE 809.19(1)(d) and (e) require appellate briefs to contain appropriate references to the record and citation of supporting legal authorities, O'Malley's briefing contains a number of factual assertions that are not paired with any reference or citation to any portion of the record and a number of assertions about the law that are not paired with citations to legal authority. It is within our discretion to disregard such factual and legal assertions as unsupported. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (a court need not consider arguments that are unsupported by legal citations or are otherwise undeveloped).

Finally, and most troublingly, O'Malley's briefs also include false legal citations. Specifically, some of the citations in his briefs are to legal authorities that do not exist, and other citations are to legal authorities that exist but are wholly unrelated to the proposition for which they are cited. The inclusion of false legal citations in O'Malley's briefing violates WIS. STAT.

(continued)

18

**DISCUSSION**

¶49    There is no dispute that, during the course of this litigation, O'Malley signed a settlement agreement that expressly provided that it was intended to be a full settlement of all claims that were or could have been brought in the litigation.  The agreement, which was not contingent on any future event except the closing of the real estate sale, was made in writing and subscribed by each party; therefore, the statutory requirements for a binding and enforceable settlement agreement are satisfied.  *See* WIS. STAT. § 807.05; *see also **Affordable Erecting, Inc. v. Neosho Trompler, Inc.**,* 2006 WI 67, ¶¶22-24, 28, 291 Wis. 2d 259, 715 N.W.2d 620 (interpreting § 807.05).[6]

¶50    On appeal, O'Malley makes a number of arguments about why the circuit court should not have enforced the settlement agreement, which called for the dismissal of the lawsuit.  His arguments are at times difficult to parse, only some of them were raised during the circuit court proceedings, and many are not

---

RULE 809.19(1)(e) and (4)(b).  The sisters pointed out these false citations in their respondents' brief, but O'Malley did not acknowledge the error in his reply brief and instead continued to use the same false citations.  This is a significant violation of court rules; accordingly, we considered whether, on our own motion, to order O'Malley to show cause why he should not be sanctioned for the false citations pursuant to RULE 809.19(2), which provides broad authority to issue sanctions for a failure to comply with this court's rules.  In the end, we decline to issue such an order in favor of a prompt resolution of this appeal.  But we caution O'Malley not to repeat this violation in any future filings in this or any court.  We offer an additional note of caution—if the root of the problem is that O'Malley used generative AI for legal research and trusted it to provide accurate results, he should be aware that there are many reported instances in which generative AI has hallucinated nonexistent cases and misreported the holdings of existing cases.

[6] WISCONSIN STAT. § 807.05 provides: "No agreement, stipulation, or consent between the parties or their attorneys, in respect to the proceedings in an action or special proceeding shall be binding unless made in court … and entered in the minutes or recorded by the reporter, or made in writing and subscribed by the party to be bound thereby …."  Whether a settlement agreement is enforceable under this statute is a question of law that we review de novo.  *Waite v. Easton-White Creek Lions, Inc.*, 2006 WI App 19, ¶5, 289 Wis. 2d 100, 709 N.W.2d 88 (2005).

supported by citations to the record or legal authority. We now consider O'Malley's arguments as best as we understand them.

¶51 We begin with O'Malley's arguments about purportedly unfilled "conditions precedent" to the dismissal of the lawsuit. Whether the conditions precedent to the enforcement of a settlement agreement have been fulfilled involves both questions of law (what the agreement requires) and questions of fact (whether those things occurred as the agreement requires). *Schlosser v. Allis-Chalmers Corp.*, 86 Wis. 2d 226, 244, 271 N.W.2d 879 (1978) (the meaning of an unambiguous contract is a question of law); *Smith Realty Co. v. Zimmerman*, 75 Wis. 2d 11, 17, 248 N.W.2d 472 (1977) (whether a party's activities constitute performance of its obligations under a contract may present a question of fact).

¶52 O'Malley argues that the circuit court erred by dismissing the lawsuit pursuant to the settlement agreement without regard to whether the conditions precedent to dismissal had been satisfied. Specifically, O'Malley contends, those conditions were "the proper transfer of corporate ownership" and "an honest allocation of the sale proceeds," which, O'Malley asserts, "did not occur." "[A]t minimum," O'Malley argues, the court should have "held an evidentiary hearing on whether the settlement conditions were met" but the court "instead … enforced the [settlement] agreement without inquiry."

¶53 This argument is ahistorical—as noted, the circuit court did hold an evidentiary hearing, and during the hearing it gave explicit consideration to whether everything that the agreement contemplated happening prior to dismissal had occurred. The court found that everything the agreement contemplated had indeed occurred, and O'Malley does not persuade us that the court erred with respect to any determination on these points.

¶54 To illustrate, regarding the first alleged condition precedent—the transfer of corporate ownership—the circuit court found that the sisters had attempted to transfer their shares to O'Malley. The court also implicitly found that O'Malley did not have any valid reason to refuse to accept their shares. Therefore, the court ordered that the corporation belonged to O'Malley as of the date of the closing, thus fulfilling that aspect of the settlement agreement.

¶55 Although O'Malley continues to argue that no proper transfer of corporate ownership occurred, his argument is unsupportable. The argument appears to be based on his assertion that the sisters have not given him certain corporate documents that may or may not exist. However, O'Malley does not point to any provision of the settlement agreement that contemplated an exchange of documents. That omission is telling—although the court ordered the sisters to produce the records in their possession after they offered to do so, there was nothing in the settlement agreement that required any particular records or documents to be provided. Therefore, there was no unfulfilled condition precedent regarding the transfer of corporate ownership.[7]

---

[7] Indeed, rather than arguing on appeal that the settlement agreement required the transfer of any specific documentation, O'Malley points to the statutory provisions in WIS. STAT. §§ 180.1602-1604 that govern a shareholder's right to inspect corporate records and a corporation's statutory responsibilities with respect to a shareholder's written notice for an inspection of corporate records. There are several independent problems with any argument O'Malley might be making about these statutes. First, O'Malley did not make any argument based on §§ 180.1602-1604 during the circuit court proceedings. Second, he does not specifically identify any notice that he sent to the corporation's registered agent, as required by § 180.1602(2)(c) and WIS. STAT. § 180.1150(1)(c). Third, § 180.1604 addresses a shareholder's recourse against a corporation that refuses to allow inspection; therefore, any claim under that statute would be against the corporation, not against his sisters. As O'Malley acknowledges elsewhere in his brief, the corporation is not a party to this litigation. Finally, even if O'Malley had shown a violation of §§ 180.1602-1604, he does not point to anything in the settlement agreement establishing that compliance with these statutes was a prerequisite to transferring ownership of the corporation.

¶56 Regarding the second alleged condition precedent, the allocation of sale proceeds, the circuit court found that the proceeds were disbursed in accordance with the settlement agreement and the closing statement, which had been approved by O'Malley. O'Malley does not argue that this finding is clearly erroneous, nor does he dispute that he actually received his share of the proceeds, as reflected in the closing statement. Therefore, to the extent that the proper disbursement of sale proceeds was a condition precedent of dismissal, that aspect of the settlement agreement was also fulfilled.

¶57 O'Malley makes arguments about the sale proceeds on appeal, but his concern does not appear to be about how the net proceeds were disbursed (that is, all to the siblings and none to the corporation). Instead, as best as we understand it, his concern appears to be that, following the closing, a portion of the lump sum payment for the real estate may have been attributed to the commercial parcel that had been owned by the corporation. O'Malley contends that this attribution of value has tax consequences and his concern may or may not be valid as an accounting and tax matter, but it is wholly irrelevant to the issue here. The issue is whether there were any remaining conditions that had to be fulfilled before the litigation was dismissed pursuant to the settlement agreement, and there were no terms in that agreement that addressed the tax consequences of the real estate transaction. Nor were there any terms that addressed how the payment should be allocated between the two parcels that were included in the real estate sale. Therefore, O'Malley has not identified an unfulfilled condition precedent to dismissal pursuant to the settlement agreement.

¶58 We now turn to O'Malley's numerous arguments about the sisters' pre-settlement actions with respect to managing the corporation. In continuing to advance these arguments, O'Malley does not come to grips with the fact that he

signed a settlement agreement that resolved all of the claims he had raised in the litigation and that also included a mutual release. Accordingly, the sisters' pre-settlement actions are no longer relevant for purposes of this litigation unless there is some reason that the settlement agreement is unenforceable.

¶59 O'Malley makes several arguments about why the settlement agreement is unenforceable which we now consider and reject.

¶60 To the extent that O'Malley renews an argument about undue influence or duress, the circuit court determined that the facts O'Malley testified to did not amount to either. O'Malley does not develop an argument as to why that determination is erroneous. He does make some assertions about being under "pressure from multiple directions," about the quality of representation he received from his attorney during settlement negotiations, and about the sisters' attorney's "last-minute" insistence that the corporation be included in the settlement agreement and its mutual release, but he does not attempt to pair those arguments with the elements of either legal doctrine.[8]

¶61 Instead, O'Malley makes new arguments about alleged fraudulent inducement or alleged material breaches of the settlement agreement. Although

---

[8] Undue influence is a legal theory that is typically used as a basis for objecting to a will, and has no apparent relevance here. *See* ***Kehrbert v. Pribnow***, 46 Wis. 2d 205, 208-09, 174 N.W.2d 256 (1970) (discussing the elements of undue influence, which are susceptibility, opportunity, disposition, and the achievement of a coveted result).

Economic duress can be a defense to the enforcement of a contract, but a party alleging economic duress must prove that the party was the victim of a wrongful or unlawful act; the act or threat deprived the party of the party's unfettered will; and as a result, the party was compelled to make a disproportionate exchange of values or give something up for nothing. ***Wurtz v. Fleischman***, 97 Wis. 2d 100, 109, 293 N.W.2d 155 (1980). O'Malley has not shown that any of these elements were satisfied here.

O'Malley discussed the sisters' pre- and post-closing conduct in detail in his circuit court filings, he did not develop any theory based on fraudulent inducement or material breach in the arguments he made in the circuit court. We could disregard O'Malley's argument on that basis,[9] but we choose to further address those arguments for completeness.

¶62    Beginning with fraudulent inducement, for O'Malley's argument to have any merit, there would have to be facts showing that the sisters engaged in fraudulent conduct *before* the settlement agreement was executed. ***Kaloti Enterprises, Inc. v. Kellogg Sales Co.***, 2005 WI 111, ¶42, 283 Wis. 2d 555, 699 N.W.2d 205 ("[t]o invoke this narrow fraud in the inducement exception," the misrepresentation must occur "before the contract was formed"). Here, there were no facts identified in O'Malley's circuit court filings or that were adduced at the hearing that would support an argument that fraudulent conduct occurred before the settlement agreement was executed. To be sure, O'Malley's pro se supplemental brief in opposition to dismissal asserted that there were "serious concerns of potential fraud" with respect to post-closing documentation that allocated the purchase price between the two parcels of real estate, but O'Malley fails to explain how post-closing conduct that occurred after the settlement agreement was signed could have induced him to sign the agreement.

¶63    As for O'Malley's argument that the sisters materially breached terms in the settlement agreement, there are several significant problems. Most

---

[9] *See **Green v. Hahn***, 2004 WI App 214, ¶21, 277 Wis. 2d 473, 689 N.W.2d 657 ("Except in rare circumstances that are not present here, we will not address an issue that an appellant raises for the first time on appeal, because doing so undermines judicial economy and creates an incentive for parties to build in error in order to have an adverse outcome in the trial court overturned on appeal.").

notably, O'Malley has not identified any conduct by the sisters that would constitute a material breach of any term in the settlement agreement. As mentioned, the agreement did not require the sisters to provide any particular documents, and did not address how the purchase price would be allocated between the parcels of real estate. To the extent that O'Malley or the corporation could potentially have a legal claim against someone or something with respect to any pre- or post-closing actions, including how the settlement proceeds were reported for tax purposes, he does not identify any legal theory under which that potential claim would prevent the settlement agreement from being enforced.[10]

¶64    Separately, O'Malley also makes some arguments about the propriety of the role that the attorney who represented his sisters played in the litigation. Specifically, O'Malley asserts that the attorney was engaged in "dual representation" because he was "speaking for the corporation" as well as his sisters during the settlement negotiations, and that the attorney continued to represent the corporation in the litigation that occurred after the settlement agreement was signed. O'Malley argues that the attorney "claimed to represent a company they no longer owned—against the interests of its sole shareholder," and he suggests that the circuit court erred by not requiring "proof of [the attorney's] authority to represent the corporation post-closing."

¶65    These arguments fail because, among other things, they are not supported by the record. Most notably, O'Malley does not identify any occasion

---

[10] In his appellate briefing, O'Malley makes a more general argument about "post-signing misconduct" which, he asserts, could prevent the settlement agreement from being enforced. However, as legal authority for this proposition, he includes a citation to a purported Wisconsin Court of Appeals case that does not exist. This is consistent with other false case citations that are scattered throughout his briefs, which we disregard.

during this litigation in which the attorney who represented the sisters purported to represent or speak for the corporation. O'Malley asks us to infer that the attorney must have been representing the corporation's interests, rather than the sisters' interests, because the attorney insisted that the corporation be included as a party to the settlement agreement and because the attorney argued against some of the requests that O'Malley made in the circuit court, but that inference does not hold up. The sisters, who had been corporate shareholders and had participated in its management, would have had good reasons to want the corporation to be included in the settlement agreement so that O'Malley, who would control the corporation after the closing, would be precluded from bringing claims against them on the corporation's behalf. And the sisters would also have had a personal stake in wanting the litigation to be dismissed. The fact that the sisters' attorney pushed for these positions in and out of court is not proof that the attorney was representing the corporation rather than or in addition to the sisters in this litigation.[11]

¶66 Finally, O'Malley makes a series of due process arguments about how his right to be heard was violated by the "truncated" proceedings held by the circuit court. Specifically, O'Malley takes issue with the fact that the court limited the time devoted to the evidentiary hearing, sustained a number of objections to the relevance of evidence he wanted to offer, and dismissed the case even though,

---

[11] Conversely, O'Malley argues that if the attorney did not represent the corporation during the settlement negotiations, that could create a different problem, in that the corporation would be bound to an agreement it entered without its own counsel. O'Malley does not cite any legal authority to support his assertion that this creates a problem, and we see no problem under these facts. As noted, all of the shareholders of the corporation were parties to the settlement agreement, and O'Malley fails to explain why the shareholders could not collectively reach an agreement to which the corporation would also be bound.

O'Malley asserts, a number of O'Malley's motions remained "unresolved." None of these arguments have merit.

¶67     O'Malley's assertion that he had pending motions that were not resolved prior to dismissal is not borne out in the record.[12]  O'Malley may mean to argue that the circuit court dismissed the litigation without addressing every argument that O'Malley wanted the court to address, but he has not identified any reason that the court was required to address these arguments, given the court's determination that there was an enforceable settlement agreement that called for dismissal of the litigation.  It was also within the court's discretion to exclude irrelevant evidence that went beyond the scope of the hearing, and we agree with the court's view on the proper scope of the hearing.  The additional evidence that O'Malley wanted to offer may have been relevant to a number of potential claims that O'Malley would have liked to bring against his sisters, but it was not relevant to the narrow issue before the court, which was whether the settlement agreement should be enforced.  Finally, regarding the two-hour time slot that the court

---

[12] The record reflects that O'Malley filed three motions, the first two on December 16, 2024, and the third on the morning of January 7, 2025.  The December 2024 motions asked the circuit court to allow him to proceed pro se, to consider his pro se brief, and to seal certain documents that he had filed, and the court did that.  O'Malley's January 2025 motion asked the court to "delay any subsequent hearings … for 60 days following receipt of still missing corporate records to allow [O'Malley] time to secure replacement counsel and to review corporate records," and the court gave its reasons for denying that motion during the hearing that took place that same day.

O'Malley's appellate briefing makes references to "motions to compel" that O'Malley says he filed during the circuit court proceedings, but there is nothing in the record that supports O'Malley's assertion that he filed a motion to compel.  O'Malley may be referring to the pro se motions he filed in December 2024 and in January 2025 that we addressed in the preceding paragraph; if so, none of these documents contained any motion to compel.  Likewise, although O'Malley asserts that his January 2025 motion "condition[ed] withdrawal" of his third set of attorneys on his sisters' "production of missing corporate records and time for review," the motion did no such thing.

devoted to the evidentiary hearing, it is within a circuit court's discretion to schedule proceedings in a manner that balances the need of any one case against the needs of others. *See* **Hefty v. Strickhouser**, 2008 WI 96, ¶31, 312 Wis. 2d 530, 752 N.W.2d 820 ("circuit courts have discretion to control their dockets"). Here, we are not persuaded that the court erred by allotting two hours for the hearing, especially given the narrow issue that was before the court.[13]

¶68 For all of the above reasons, we conclude that the circuit court did not err in enforcing the settlement agreement and dismissing this litigation with prejudice pursuant to that agreement.

*By the Court.—*Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[13] To the extent that O'Malley makes any additional arguments in his appellate briefs that we have not explicitly addressed here, we reject those arguments as undeveloped, unsupported, or unpersuasive. **Pettit**, 171 Wis. 2d 627, 646-47.